**LABOUNTY MANUFACTURING, INC., Appellant,**

v.

**UNITED STATES INTERNATIONAL TRADE COMMISSION, Appellee,**

**Dudley Shearing Machine Manufacturing Co., Ltd., Intervenor–Appellee.**

**No. 90–1282.**

United States Court of Appeals, Federal Circuit.

March 12, 1992.

Rehearing Denied May 5, 1992.

---

R.V. Lupo, William Brinks Olds Hofer Gilson & Lione, Washington, D.C., argued, for appellant. With him on the brief were Donna M. Tanquay and Mark G. Davis. Also on the brief were H. Dale Palmatier and Gerald E. Helget, Palmatier & Sjoquist, Minneapolis, Minn.

Jean H. Jackson, Office of the General Counsel, U.S. Intern. Trade Com'n, Washington, D.C., argued, for appellee. On the brief for the appellee were Lyn M. Schlitt, General Counsel, James A. Toupin, Asst. General Counsel and John M. England, Jr., Office of General Counsel, U.S. Intern.

Trade Com'n, Washington, D.C. W. Thad Adams, III, of W. Thad Adams, III, P.A., Charlotte, N.C., argued, for intervenor-appellee.

Before NIES, Chief Judge, LOURIE and RADER, Circuit Judges.

NIES, Chief Judge.

LaBounty Manufacturing, Inc., appeals from the final determination of the United States International Trade Commission (ITC) in Investigation No. 337–TA–252, *Certain Heavy Duty Mobile Scrap Shears,* that U.S. Patent No. 4,519,135 ('135) was unenforceable due to inequitable conduct and thus, no violation of 19 U.S.C. § 1337 (1988) was established by Dudley Shearing Machine Manufacturing Co., Ltd. We affirm.

## I.

### BACKGROUND

#### A. *History of the Litigation*

LaBounty filed a complaint with the ITC in 1986, alleging a violation of the Tariff Act of 1930, as amended, 19 U.S.C. § 1337 by Dudley Shearing Machine Manufacturing Co., Ltd., a British manufacturer of scrap shears, and its U.S. subsidiary, Dudley Shearing Inc. (collectively, "Dudley") due to the importation and sale of Dudley's heavy-duty mobile scrap shears that were alleged to infringe all 22 claims of the '135 patent owned by LaBounty.[1] In the initial phase of this case, the ITC held there was no violation of the statute because Dudley did not infringe any claim of the '135 pat-

ent. The ITC did not reach the issues of validity and enforceability of LaBounty's patent. On appeal, this court vacated the noninfringement finding and remanded the case for reconsideration. *LaBounty Mfg. Inc. v. United States Int'l Trade Comm'n,* 867 F.2d 1572, 9 USPQ2d 1995 (Fed.Cir. 1989).

The remand resulted in a second determination by the ITC that there was no section 1337 violation, this time on the ground that LaBounty's '135 patent is unenforceable due to inequitable conduct during prosecution in that LaBounty intentionally withheld material prior art from the Patent and Trademark Office (PTO). Specifically, LaBounty was found to have failed to disclose certain devices denominated the "MS107," "Adamo/Dodge," and "Ace" shears, which it had placed on sale or in public use more than one year prior to filing the application for the '135 patent. These shears were found to either anticipate certain claims of the '135 patent or, in any event, to be "far closer to the claimed inventions than any of the art cited by the examiner...." *Scrap Shears,* Inv. No. 337–TA–252, slip op. at 96. From all of the evidence, the ITC found that LaBounty had intended to mislead the PTO and that the '135 patent was therefore unenforceable due to LaBounty's inequitable conduct.

#### B. *Patented Invention*

The '135 patent relates to a type of heavy duty scrap shear for use in cutting up scrap metal, especially iron or steel pipes and structural steel.[2] The shear is

---

**1.** Section 1337(a) states, in pertinent part, that the following are unlawful:

Unfair methods of competition and unfair acts in the importation of articles ... into the United States, or in the sale of such articles by the owner, importer, or consignee, the threat or effect of which is—
(i) to destroy or substantially injure an industry in the United States;
(ii) to prevent the establishment of such an industry; or
(iii) to retrain or monopolize trade and commerce in the United States.

**2.** For a more complete description of the invention, *see LaBounty,* 867 F.2d at 1573–74, 9

USPQ2d at 1996–97. Claim 7 of '135, primarily in contention here, reads:

A heavy duty scrap shear for attachment to the boom structure and hydraulic system of a backhoe, comprising
a lower jaw and an upper jaw and pivot means interconnecting the jaws together, the lower jaw having frame means for attachment to the boom structure of the backhoe and the upper jaw having means for attachment to the hydraulic system of the backhoe for closing and opening the upper jaw relative to the lower jaw,
the lower jaw and the upper jaw having rigid lower and upper shear blades extending along each other and having a thickness and a width

designed to be attached to the boom structure and hydraulic system of a construction machine known as a "backhoe." The shear is comprised of two jaws engaged in a scissor-like fashion, one lower and one upper. The upper jaw is a single movable shear (cutting) blade, whereas the stationary lower jaw has two blades—one shear blade and one guide blade. The invention operates by way of the upper blade closing upon the lower *shear* blade causing the workpiece to be severed in a single place. The guide blade performs a "receive and support" function for the workpiece as explained in the specification of the '135 patent:

> The guide blade ... has its upper edge spaced well below the cutting edge of the lower shear blade. The guide blade will thereby provide ... support for the workpiece after the blades have sheared off a length of the workpiece. The backhoe boom and shear may then be swung to the side and thereby move the shear blade along the workpiece in preparation for cutting off another length of the workpiece. As a result, a long girder or pipe or heavy cable may be cut several times into short lengths without dropping the workpiece and without having to repeatedly pick the workpiece off the ground.

As indicated above, the upper edges of both the inner (the part closer to the pivot) and outer portions of the guide blade are offset below the cutting edge of the lower shear blade to provide a cradle to receive and support the workpiece after the cut. This offset acts to minimize the possibility of double-cutting, which occurs when both the shear and guide blades cut the workpiece.

> greater than the thickness to provide strength for shearing a workpiece of such scrap metal when the upper blade is closed onto the lower shear blade,
>
> the upper and lower shear blades having inner and outer workpiece engaging edge portions opposite to each other and also having intermediate portions between said inner and outer edge portions, the inner and outer edge portions of the upper shear blade extending obliquely of each other,
>
> the lower jaw also having a rigid guide blade lying along and spaced from the lower shear

## II.

## INEQUITABLE CONDUCT

 Applicants for patents are required to conduct themselves with candor in their dealings with the PTO. Thus, if an applicant withholds material information from the PTO with intent to affect the allowance of claims, the applicant may be found guilty of inequitable conduct and the patent obtained would be rendered unenforceable. *FMC Corp. v. Manitowoc Co.*, 835 F.2d 1411, 1415, 5 USPQ2d 1112, 1115 (Fed.Cir.1987). The elements of materiality of withheld information and culpable intent must be established by clear and convincing evidence. An equitable judgment must be made that, in light of all the particular circumstances, the conduct of the patentee is so culpable that its patent should not be enforced. *Hewlett–Packard Co. v. Bausch & Lomb, Inc.*, 882 F.2d 1556, 1566, 11 USPQ2d 1750, 1755 (Fed.Cir.1989), *cert. denied*, 493 U.S. 1076, 110 S.Ct. 1125, 107 L.Ed.2d 1031 (1990); *Kingsdown Medical Consultants v. Hollister Inc.*, 863 F.2d 867, 876, 9 USPQ2d 1384, 1392 (Fed.Cir. 1988), *cert. denied*, 490 U.S. 1067, 109 S.Ct. 2068, 104 L.Ed.2d 633 (1989); *J.P. Stevens & Co. v. Lex Tex Ltd.*, 747 F.2d 1553, 1560, 223 USPQ 1089, 1092 (Fed.Cir.1984), *cert. denied*, 474 U.S. 822, 106 S.Ct. 73, 88 L.Ed.2d 60 (1985). While the ultimate decision that inequitable conduct occurred is committed to a trial judge's discretion, *Manville Sales Corp. v. Paramount Sys.*, 917 F.2d 544, 551, 16 USPQ2d 1587, 1592 (Fed.Cir.1990), the decision may not be upheld where the exercise of discretion rests on erroneous findings of facts or on a misunderstanding of the law. *Id.* Such

> blade to permit the upper shear blade to pass therebetween,
>
> and the guide blade having a top supporting surface spaced below the cutting edge of the lower shear blade by a distance at least as great as the approximate thickness of the lower shear blade to be normally spaced below the workpiece on the shear blade, the top supporting surface extending along both of the inner and outer edge portions of the lower shear blade to receive and support the workpiece after the workpiece is severed by the shear blades.

findings of the ITC may be overturned only if they are unsupported by substantial evidence. *See Tandon Corp. v. United States Int'l Trade Comm'n.*, 831 F.2d 1017, 1019, 4 USPQ2d 1283, 1284–85, 5 Fed.Cir.(T) 129, 130 (Fed.Cir.1987) (citing 19 U.S.C. § 1337(c), which incorporates 5 U.S.C. § 706(2)(E) (1988)).

As grounds for reversal of ITC's determination of inequitable conduct, LaBounty argues that it withheld no material prior art from the PTO and, thus, could not be guilty of inequitable conduct. Per LaBounty, (1) the undisclosed Adamo/Dodge and Ace shears were not prior art devices because they were offered for sale and used by prospective customers only for experimental purposes and (2) the MS107 shears, a device admittedly on sale, does not anticipate the claims of the '135 patent and was substantially disclosed in U.S. Patent No. 4,198,747 ('747) which was before the PTO examiner. LaBounty also asserts it held a good faith belief that the above devices did not have to be disclosed to the PTO, and that, therefore, the requisite "intent to deceive" was lacking.

## A. *Prior Art*

■ The patent statute provides, in pertinent part, in 35 U.S.C. § 102 (1988):

A person shall be entitled to a patent unless—

\* \* \* \* \* \*

(b) the invention was ... in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States....

Section 102(b) may create a bar to patentability either alone, if the device placed on sale is an anticipation of the later claimed invention or, in conjunction with 35 U.S.C. § 103 (1988), if the claimed invention would have been obvious from the on-sale device in conjunction with the prior art.[3] *In re Corcoran*, 640 F.2d 1331, 1333, 208 USPQ 867, 869 (CCPA 1981). As stated in *Baker*

*Oil Tools v. Geo Vann, Inc.*, 828 F.2d 1558, 1563, 4 USPQ2d 1210, 1213 (Fed.Cir.1987): "If a device was in public use or on sale before the critical date, then that device becomes a reference under section 103 against the claimed invention."

■ The general purpose behind section 102(b) bars is to require inventors to assert with due diligence their right to a patent through the prompt filing of a patent application. 2 Donald S. Chisum, *Patents* § 6.01 (1991). However, a patentee may escape the section 102(b) bars on the ground the use or sale was experimental.

"[A] use or sale is experimental for purposes of section 102(b) if it represents a bona fide effort to perfect the invention or to ascertain whether it will answer its intended purpose.... If any commercial exploitation does occur, it must be merely incidental to the primary purpose of experimentation to perfect the invention." *Pennwalt Corp. v. Akzona Inc.*, 740 F.2d 1573, 1580–81, 222 USPQ 833, 838 (Fed.Cir.1984) (citations omitted). Factors accepted to show an inventor's experimental relationship with a customer despite a sale have included, for example, an agreement by the customer to use the device secretly and keep records of progress, *see In re Smith*, 714 F.2d 1127, 1137, 218 USPQ 976, 984 (Fed.Cir.1983); a doctor-patient relationship where the inventor/doctor conducted the experimentation, *TP Labs. v. Professional Positioners, Inc.*, 724 F.2d 965, 972, 220 USPQ 577, 582 (Fed.Cir.), *cert. denied*, 469 U.S. 826, 105 S.Ct. 108, 83 L.Ed.2d 51 (1984); and the continued control by the inventor of the patented equipment while in the hands of a purchaser, *Baker Oil Tools*, 828 F.2d at 1564, 4 USPQ2d at 1214.

■ An inventor's protestation of an intent to experiment, expressed for the first time during litigation, is of little evidentiary value, at best. *In re Brigance*, 792 F.2d 1103, 1108, 229 USPQ 988, 991 (Fed.Cir.1986); *TP Labs.*, 724 F.2d at 972,

---

**3.** LaBounty asserts that reduction to practice is a requirement for a device to be *prior art* under section 102(b). This assertion is off the mark. A section 102(b)/103 bar obviously concerns a device which is not a reduction to practice of

the claimed invention. Nevertheless, such an on-sale device is prior art. *See UMC Elecs. Co. v. United States*, 816 F.2d 647, 656, 2 USPQ2d 1465, 1471 (Fed.Cir.1987), *cert. denied*, 484 U.S. 1025, 108 S.Ct. 748, 98 L.Ed.2d 761 (1988).

220 USPQ at 583. Indeed, "an inventor's subjective intent is immaterial when objective evidence points otherwise." *Harrington Mfg. Co. v. Powell Mfg. Co.*, 815 F.2d 1478, 1481 n. 3, 2 USPQ2d 1364, 1366 n. 3 (Fed.Cir.1986).[4] When sales are made in an ordinary commercial environment and the goods are placed outside the inventor's control, an inventor's secretly held subjective intent to "experiment," even if true, is unavailing without objective evidence to support the contention. *Brigance*, 792 F.2d at 1108, 229 USPQ at 991. Under such circumstances, the customer at a minimum must be made aware of the experimentation. As stated in *In re Dybel*, 524 F.2d 1393, 1401, 187 USPQ 593, 599 (CCPA 1975), "[Inventor's] failure to communicate to any of the purchasers or prospective purchasers of his device that the sale or offering was for experimental use is fatal to his case."

■ The decision of the administrative law judge (ALJ) contains numerous findings which establish the commercial nature of LaBounty's activity with respect to the use of the Adamo/Dodge shears by John Adamo at a Dodge plant in Michigan as well as the absence of any objective evidence that such use was experimental. In pertinent part it reads:

> [I]t is clear that inventor Roy LaBounty gave Acme Equipment [a shears dealer] LaBounty's prices for the Adamo Dodge scrap shear; ... and that Adamo was thereafter concerned in trying the shear [to determine] whether the shear would perform sufficiently to pay for itself.... LaBounty's own mailing log indicates that all shear prices were sent out to Acme Equipment on March 4, 1981, and LaBounty's price sheets show that LaBounty had a price sheet for the MSD 218 [Adamo/Dodge] shear stating that LaBounty's prices were "effective March 1st, 1981". Found in LaBounty's files is an unsigned letter from LaBounty to [Acme] giving price and warranty terms

for the MSD 218 shear, and with an enclosure of a picture of the shear.

\* \* \* \* \* \*

> [Roy LaBounty] testified at his deposition that he billed [Acme] and Adamo $26,000 for the shear, and on redirect at the hearing he testified that he [gave Acme] a figure of the cost for the MSD 218 shear. Consistent with this testimony LaBounty's invoice for the shear to Acme recites a delivery charge and purchase price of 20% off, resulting in $26,000 total, *payable after two weeks of successful trial.* Such a notation of prompt payment terms on the invoice is inconsistent with LaBounty's testimony that the invoice was used merely for internal accounting purposes, and the notation provides contemporary documentation of LaBounty's expectation that the customer would pay that price for the machine if it had two weeks of successful trial of the shear. LaBounty's production order for making the shear refers to a verbal order for the machine from [Acme] and the handwritten remarks on that form indicate a price of $32,000 less 20%, plus a delivery charge, for a sales price of $26,000. In view of [testimony from an Acme employee] that he had to give the customer a discounted price because of the customer's concerns about profitable use, this is further support for the fact that a firm price was given by LaBounty to [Acme].... Consistent with the terms of the January 21, 1981 letter and the March 4, 1981 invoice, [an Acme employee] also testified that *sale to the customer was contingent upon the customer's satisfactory trial of the shear "to do" the job which the customer had asked for the shear.*

There is no objective evidence of record that LaBounty had told Adamo and [Acme] that the shear was still developmental and subject to change, and experimental. The fact that the model was known by Adamo to be a specially built prototype is found not to be sufficient to

---

**4.** *But see Moxness Prods. v. Xomed, Inc.,* 891 F.2d 890, 13 USPQ2d 1169 (Fed.Cir.1989), which overturned grant of JNOV but remanded for a new trial where testimony of *co-inventors* conflicted over similar issue.

detract from the demonstrated commercial purpose of the use and offer for sale to Adamo.

*Scrap Shears,* Inv. No. 337–TA–252, slip op. at 61–63 (emphasis added).[5]

With respect to the Adamo/Dodge shear delivered to United Scrap, the ALJ made the following findings:

[A signed letter from Roy LaBounty to Jerry Fisher, then co-owner of United Scrap,] offers the Adamo Dodge shears, refers to a picture of the shear, warranties the shear as new, although it had been used, and quotes a price and payment terms for the shear. The letter affirmatively represents that "the MSD Shears ... we have on hand ... [have] proven to be very successful in cutting rebar, cables, pipes, angles and beams." No indication is given in this letter, or from the recounted conversations between Roy LaBounty and United Scrap's Fisher, and then with Dellinger [Scrap's general manager], that the shear was experimental, confidential, still in development, or unproven.... The [ALJ] determines that the transaction between LaBounty and United Scrap shows that the purchase of the shear was contingent on United Scrap's satisfaction with the shear's ability to cut aluminum wrap beams, a specific type of large pipe.

[Following two months of use,] United Scrap made its decision that it was unsatisfactory for [its] operation.... The shear did not have good production in cutting the aluminum wrap beams for which United Scrap had wanted the shears, as occasionally the aluminum would get stuck and jammed between the tines and the jammed aluminum scrap would have to be melted out, an expensive operation. [However, the] shear was satisfactory in cutting steel angles and channels....

*Id.* at 64–65.

With respect to the use of the Ace shear at the Ace Demolition plant in Pennsylvania, the ALJ made the following findings which establish that LaBounty's activities were commercial:

Ace Demolition's Gross [co-owner] testified that he was not told by LaBounty that the delivered shear was experimental, or that it might not work. Inventor Roy LaBounty's letter of July 30, 1980 to Gross stated that the shear had been tested. There is no evidence of any LaBounty statement to Ace Demolition that the shear would be evaluated for further development and possible changes by LaBounty, or that its operation was subject to doubt or evaluation by LaBounty. No specific types of reporting was asked of Ace Demolition before the shear was delivered to Ace Demolition.

\* \* \* \* \* \*

The Ace Demolition shear ... was accessible to public view at [Ace Demolition's] yard, and was viewed by LaBounty's competitor Ramun, and at least one of LaBounty's prospective customers.... No restriction concerning confidentiality or public access was imposed on Ace Demolition by LaBounty. There is no evidence that the Ace Demolition shear was inoperable or subject to fundamental operation defects. The [ALJ] determines that the fact that the shear was not found satisfactory for Ace Demolition's commercial purposes does not establish that the shear was fundamentally inoperable to prevent its use as a shear attachment for shearing scrap metal.

*Id.* at 54–56 (footnote omitted).

Lastly, regarding the use of the Ace shear at Laro Coal, commercialization of the device, as well as the public nature of the use with respect to others in the industry, is supported by the evidence, as follows:

A letter dated July 13, 1981 from Kuhlman [a shear dealer] to Roy LaBounty confirmed their agreement on a shear.... The complete cost of the shear attachment was stated to be $28,-000.... Consistent with the principal concern involving the customer's satis-

5. Citations to the ALJ's numbered findings of fact have been omitted throughout this quota-tion.

faction with the shear's output, the letter rental purchase agreement and corresponding LaBounty invoice for the MSD shear provided for a three month term of rental.... The shear encountered a problem with scrap going between the outer tines jamming on its first day of operation at Laro Coal, causing some down (non-working) time of the machine and lost production time for the shear. The problem was noticed right away by [Roy LaBounty and Kuhlman, as well as] Goodstein [of Laro] who was unhappy with the downtime.... *Despite the technical problem being apparent immediately, the shear was continued in use at Laro Coal in the same general operation* on its scrap pile and made production for Laro Coal in shearing that pile for an extended length of time until [it was redesigned].... While the shear was at Laro Coal's yard and before it was redesigned, *LaBounty sent pictures of it to another prospective customer and stated that the shear was effective and available for viewing* by the prospective customer at Laro Coals yard.

*Id.* at 56–58 (emphasis added).

■ Clearly, LaBounty's offers to sell and sales of each device on their face were ordinary commercial-type transactions. The customers were not told the devices were experimental, kept no records, did not keep the devices secret, and made them available for viewing by others in the industry. LaBounty, nevertheless, argues that, because the customers were given a money-back guarantee if they were dissatisfied, their use was experimental. However, a money-back guarantee is a typical commercial sales provision and does not establish an experimental relationship between the parties.

Similarly, that the Ace and Adamo/Dodge shears performed unsatisfactorily for the users' particular need and eventually were returned does not mandate the conclusion of no on-sale bar. Instead, the ITC's determination seems inescapable that the "testing" of LaBounty's shears by Ace Demolition, John Adamo, Laro Coal, and United Scrap was for the benefit of the customers, who wanted to determine whether to purchase one of LaBounty's shears, and did not constitute experimental use for the benefit of the inventor. It is well settled that "testing" of a device to determine suitability for a customer's particular (unclaimed) need is not experimental use which negates commercialization by the inventor. *See In re Theis*, 610 F.2d 786, 792–93, 204 USPQ 188, 193–94 (CCPA 1979). Finally, that LaBounty needed to test its device in the facilities of others (which were not shielded from the public) is irrelevant where LaBounty set up no testing arrangement. *Cf. Harrington*, 815 F.2d at 1481, 2 USPQ2d at 1366 (need to test agricultural equipment in field created no genuine issue of fact respecting public use bar where device was exhibited before journalist under no secrecy arrangement).

For the foregoing reasons, we affirm the ITC's determination that LaBounty's Adamo/Dodge and Ace shears were in "public use and on sale" prior to the September 13, 1981 critical date and were prior art.

## B. *The On–Sale Devices Are Not Cumulative to Art of Record*

■ Patent applicants are required to disclose to the examiner all information "material to the examination of the application." 37 C.F.R. § 1.56(a) (1991). "[I]nformation is material where there is a substantial likelihood that a reasonable examiner would consider it important in deciding whether to allow the application to issue as a patent." *Id.*

LaBounty's second attack on the ALJ's inequitable conduct determination is that the undisclosed on-sale shears would not have been material to the PTO's allowance of its claims because they disclosed no more relevant features than the prior art before the examiner, namely U.S. Patent No. 4,188,721 ('721) and the '747 patent.

LaBounty admits that two MS107 shears are prior art, having been sold to United Scrap in 1978. The ALJ found that the MS107 shears reached the pinnacle of materiality in that the shears anticipated claims 7, 10, and 13–15 of the '135 patent, which describe a single-cut shear with

three blades. LaBounty disputes the ALJ's finding of anticipation, asserting that the MS107 shear delivered to United Scrap had *two* lower *shear* blades, not one as called for in the '135 patent, and that, in any event, the record shows "uncertainty" as to the structure of the MS107 prior to the critical date. However, the evidence credited by the ALJ amply supports his finding that in the second MS107 delivered to United Scrap only one of the lower blades was a shear blade.

The ALJ found credible the testimony of Dellinger, United Scrap's General Manager, supported by photographs, who repeatedly stated that the MS107 had one lower shear blade and one lower guide blade and, hence, that it was a single-cut shear. The ALJ also supported this finding through reference to a parts list for the MS107 which indicated that the device had *one* lower *shear* blade. The ALJ additionally relied upon a notation made by Roy LaBounty on a picture of a MS107 shear in the course of litigation contemporaneous with prosecution of the '135 patent application which clearly indicated the MS107 had *one* lower *shear* blade. Lastly, the ALJ also relied upon the testimony of Dudley's expert, Robert Pond, who described the substantial distance by which the guide blade was offset from the shearing blade and established that the "guide blade when properly manipulated, can function to receive and support a workpiece after severing." *Scrap Shears*, Inv. No. 337–TA–252, slip op. at 84.

LaBounty points to a depiction of the MS107 shear in an advertisement which shows the shear in an "upside down" position (two lower blades on top, and single upper blade nearer to the ground) and argues that, in this "normal" position, it would be impossible for the MS107 to receive and support a workpiece. However, this evidence fails to show that the ALJ could not rely on Pond's testimony, which explained that the MS107 would receive and support a workpiece when operated right side up. As stated by Judge Hand in *Dwight & Lloyd Sintering Co. v. Greenawalt*, 27 F.2d 823, 828 (2d Cir.1928):

The use for which the [anticipatory] apparatus was intended is irrelevant, if it could be employed without change for the purposes of the patent; the statute authorizes the patenting of machines, not of their uses. So far as we can see, the disclosed apparatus could be used for "sintering" without any change whatever, except to reverse the fans, a matter of operation.

That principle applies here, as substantial evidence supports the ALJ's finding that the MS107 could receive and support a workpiece without any change in the structure of the shear.

With respect to the Ace and Adamo/Dodge shears, the ALJ cited testimony by Roy LaBounty, the inventor of the '135 patent, and found that, while the shears double cut some work pieces and occasionally were subject to jamming problems, both devices "were designed to single cut workpieces, and did actually single cut ... workpieces,. depending on their size...." *Scrap Shears*, Inv. No. 337–TA–252, slip op. at 67. Furthermore, the ALJ found the entire length of the Adamo/Dodge shear's guide blade was offset and that the inner portion was substantially offset below the shearing blade. Regardless of whether these offsets actually allowed the two shears to receive and support a workpiece during a cutting operation, the evidence fully supports the ALJ's finding that the structure of the two shears was far closer to that called for in the '135 patent than the prior art cited to the examiner by LaBounty.

In contrast, the '721 and '747 patents cited to the examiner by LaBounty are significantly different. The '721 patent describes a two-bladed shear, not a three-bladed shear. The '747 patent discloses a three blade device whose *two lower shearing blades* are slightly offset in order to minimize the power necessary for its designed *double-cutting* operation. Neither the '747 nor the '721 patents discloses a structure with a recessed *guide* blade, much less a guide blade which can perform the receive and support function. Clearly, the undisclosed shears have "more relevant features" than the '721 and '747 patents

which LaBounty cited to the examiner. Thus, these three undisclosed shears were not cumulative of the references before the examiner. All are material undisclosed prior art.

### C. *Intent*

 In addition to the materiality of the undisclosed information, a challenger of a patent must, to establish that the patentee acted inequitably, demonstrate that the patentee intended to mislead or deceive the PTO. Direct proof of wrongful intent is rarely available but may be inferred from clear and convincing evidence of the surrounding circumstances. *Halliburton Co. v. Schlumberger Tech.*, 925 F.2d 1435, 1442, 17 USPQ2d 1834, 1841 (Fed.Cir.1991); *Merck & Co. v. Danbury Pharmacal Inc.*, 873 F.2d 1418, 1422, 10 USPQ2d 1682, 1686 (Fed.Cir.1989); *Burlington Indus. v. Dayco Corp.*, 849 F.2d 1418, 1421, 7 USPQ2d 1158, 1160 (Fed.Cir. 1988). The ALJ expressly recognized these principles and found clear and convincing evidence of a culpable lack of candor on the basis of misleading arguments made to the PTO for allowance of the claims coupled with the withholding of contemporaneously known prior art which was highly pertinent to the prosecution of the patent application. *Scrap Shears*, Inv. No. 337–TA–252, slip op. at 102.

 During prosecution, LaBounty focused on the "receive and support" feature of its invention to overcome a rejection based on the '747 patent, arguing that the absence of this feature distinguished the reference and made the invention patentable. In fact, the "receive and support" feature is a feature of the undisclosed MS107 which LaBounty admits is prior art. The "receive and support" feature was also found to be in the undisclosed Adamo/Dodge Shears which LaBounty had made and placed on sale years before it made the argument to the PTO. *Id.* at 74–75. Had LaBounty's own prior art devices been disclosed to the PTO, the conclusion is inescapable that the prosecution would not have focused merely on the '747 patent which did not have the critical "receive and

support" feature. Thus, the evidence amply supports an inference that LaBounty acted with culpable intent to mislead or deceive the PTO by withholding its own known prior art devices and by making an argument for patentability which could not have been made had the art been disclosed. *Fox Indus. v. Structural Preservation Sys.*, 922 F.2d 801, 17 USPQ2d 1579 (Fed. Cir.1990) (inequitable conduct based on inventor's failure to disclose its own advertising brochure).

 LaBounty argues, nevertheless, that the ALJ's finding should be set aside because the issues respecting experimental use of the Adamo/Dodge and Ace shears were "close" and, therefore, Roy LaBounty and his attorney could reasonably have decided these devices did not have to be disclosed. On the contrary, that makes it all the more necessary that the devices should have been disclosed to the examiner. Close cases should be resolved by disclosure, not unilaterally by the applicant. LaBounty's further argument that the MS107 is cumulative prior art because it is substantially disclosed in the '747 patent would be true only if one overlooks the "receive and support" structure in the MS107 shear, structure which is not present in the cited reference. MS107 could not possibly be cumulative with respect to a feature not found in any disclosed prior art.

Moreover, the ALJ found the testimony of Roy LaBounty and his attorney was not "significant or persuasive." In *FMC Corp.*, we stated that:

No single factor or combination of factors can be said always to *require* an inference of intent to mislead; yet a patentee facing a high level of materiality and clear proof that it knew or should have known of that materiality, can expect to find it difficult to establish "subjective good faith" sufficient to prevent the drawing of an inference of intent to mislead. A mere denial of intent to mislead (which would defeat every effort to establish inequitable conduct) will not suffice in such circumstances.

835 F.2d at 1416, 5 USPQ2d at 1116. LaBounty has presented us with no basis to

overturn on this record the ALJ's evaluation of the credibility of LaBounty's witnesses.

Accordingly, under all of the circumstances here, we hold that the ALJ's finding of intent is supported by substantial evidence.

### III.

### CONCLUSION

For the foregoing reasons, because the '135 patent is unenforceable due to LaBounty's inequitable conduct during the patent's prosecution, we affirm the ITC's determination that no violation of section 1337 occurred.

AFFIRMED.