POLLENEX CORPORATION, a Missouri corporation, Plaintiff,

v.

SUNBEAM–HOME COMFORT, A DIVISION OF SUNBEAM CORP., a Delaware corporation, Raymond Industrial, Limited, a Hong Kong corporation, and Raymond Marketing Corporation of North America, a Delaware corporation, Defendants.

No. 92 C 0098.

United States District Court, N.D. Illinois, E.D.

Sept. 15, 1993.

Charles A. Laff, Martin L. Stern, Judith L. Grubner, Laff, Whitesel, Conte & Saret, Chicago, IL, for plaintiff.

Nate F. Scarpelli, Jeffry W. Smith, Roger Anthony Heppermann, Marshall, O'Toole, Gerstein, Murray & Borun, Chicago, IL, Arnold B. Silverman, George K. Stacey, Eckert, Seamans, Cherin & Mellott, Pittsburgh, PA, Gregory F. Hauser, Walter, Conston, Alexander & Green, P.C., New York City, Elizabeth L. Rabenold, Thorp, Reed & Armstrong, Pittsburgh, PA, for defendants.

## MEMORANDUM OPINION

BRIAN BARNETT DUFF, District Judge.

This case comes before the court on the Plaintiff's assertion that the Defendants infringed U.S. Patent No. 5,020,517 (the " '517 patent"). On July 20–22, 1993, this court conducted a bench trial on the issue of whether the '517 patent is unenforceable because of the patent applicant's alleged inequitable conduct before the U.S. Patent and Trademark Office. This court has heard the evidence and considered the credibility of the witnesses, the testimony, exhibits, memoranda of law, arguments of counsel, and each party's proposed findings of fact and conclusions of law. Now fully advised in the matter, the full trial on the issue of inequitable conduct having been concluded, the court makes the following findings.

### FINDINGS OF FACT

#### I. The Parties

1. Plaintiff Pollenex Corporation is a Missouri corporation with its principal place of business in Kansas City, Missouri. It is a wholly-owned subsidiary of The Rival Company, which formed Plaintiff to receive the assets purchased by Rival from Plaintiff's predecessor, also called Pollenex Corporation. Plaintiff's predecessor, an Illinois corporation which had a principal place of business in Chicago, Illinois, designed, developed and marketed a variety of household appliances, such as air and water filters and purifiers, whirlpool spas and the "Back Relief" massager covered by the patent-in-suit. Plaintiff's predecessor was previously known as Associated Mills, Inc. (Stip. Facts 1, 2, 3).

2. Defendant Sunbeam–Home Comfort is a division of Sunbeam Corporation and has its principal place of business in Schaumburg, Illinois. Sunbeam–Home Comfort was previously called Northern Electric Company (Stip. Fact 4).

3. Defendant Raymond Industrial, Ltd. is a Hong Kong corporation with a place of business in Hong Kong. Defendant Raymond Marketing Corporation of North America is a Delaware corporation with its principal place of business in Norwalk, Connecticut. Raymond Marketing is, at least in part, owned and controlled by Raymond Industrial and markets products manufactured by Raymond Industrial (hereinafter, both Raymond defendants will occasionally be referred to jointly as "Raymond") (Stip. Facts 5, 6, 7).

#### II. The Patent–In–Suit

4. On June 4, 1991, United States Letters Patent No. 5,020,517 ("the '517 patent"), entitled "Back Massager For Use In Home Or Auto," issued to Plaintiff's predecessor Associated Mills, as assignee of the inventors, Robert Foster, Jr. and Jefferson Gentry. Plaintiff sells the product which embodies the invention of the '517 patent under the commercial name "Back Relief" (Pl.Exh. 102).

5. Claim 1 of the '517 patent claims a back massager having the following combination of elements:

a. a cushion having two vibrating motors, one at the upper thoracic region and the other at the lower lumbar region of the cushion;

b. a control unit for applying power to the vibrating motors at either a high or a low level;

c. an air bladder at the lumbar region of the cushion;

d. a pump to inflate the air bladder and to also allow regulation of the degree of inflation of the air bladder; and

e. a jack in the control unit to receive either (1) an AC adapter for supplying power from an AC commercial power source (i.e., 110 volt household current) or (2) a DC adapter for supplying power from a DC battery power source, such as an automobile battery (Pl.Exh. 102).

6. Dependent claim 2 of the '517 patent adds a hand pump and an exhaust valve to the combination of elements in claim 1 (Pl. Exh. 102).

7. Dependent claims 4 and 6 of the '517 patent add a seat switch to remove power from the control unit when the cushion is not occupied (Pl.Exh. 102).

### III. The Prior Art Clairol Back Massagers Made By Defendant Raymond

8. In or about the summer of 1988, Raymond Industrial Ltd. began manufacturing two back massagers for Clairol. One of these massagers, called the "Easy Driver Automobile Back Massager with Heat" (Model FG–2), was intended for use solely in an automobile and was designed to be powered by an automobile battery, while the other, called "The Back Fixer Deluxe Home Back Massager With Heat" (Model FG–3), was designed for use on a conventional AC household current in a variety of locations. A third Clairol massager, called the "Back Fixer" (Model FG–1), was powered by AC household current or DC current from two rechargeable batteries. All three of these Clairol back massagers were prior art to the invention defined by the claims of the '517 patent (Stip. Facts 18, 28, 29, and 36).

9. The Clairol FG–2 and FG–3 back massagers have:

a. a cushion having two vibrating motors, one at the upper thoracic region and the other at the lower lumbar region of the cushion;

b. a control unit for applying power to the vibrating motors at either a high or a low level;

c. an air bladder at the lumbar region of the cushion;

d. a pump to inflate the air bladder and to also allow regulation of the degree of inflation of the air bladder;

e. an AC adapter for supplying power from 110 volt AC household current (FG–3), or a DC adapter for supplying power from a DC battery power source, such as an automobile battery (FG–2); and

f. a hand pump and an exhaust valve; and

g. a seat switch to remove power from the control unit when the cushion is not occupied (Def.Exh. 217 & 218).

### IV. Pollenex's Knowledge of The Clairol FG–2 and FG–3 Back Massagers Led To Foster and Gentry's Conception Of The Alleged Invention

10. By October 1988, Pollenex/Associated Mills was aware of both the FG–2 and FG–3 back massagers (Stip. Fact 31).

11. By October 1988, Pollenex/Associated Mills considered itself to have had a "complete line of back massagers" and wanted to add to its line a model equivalent to Clairol's Easy Driver Automobile Back Massager (FG–2) (Stip. Fact 32).

12. By October 27, 1988, Pollenex/Associated Mills had acquired a sample of the FG–2 back massager and was trying to find the maker of the unit or of similar items and to obtain price quotes for the manufacture of such units or items (Stip. Fact 33).

13. On October 27, 1988, David Anderson, the Import Production Manager of Associated Mills, Inc./Pollenex wrote to the Sanyei Corporation of Hong Kong enclosing a sample Clairol FG–2, saying: "This item is becoming very big in the U.S. market.... As you know AMI has a complete line of back massagers. We now want to add a model equivalent to the [FG–2] to our line. Please try to find the maker of this unit, or makers

of similar items, and obtain a price quotation" (Def. Exh. 221).

14. In the words of Jeff Gentry, one of the inventors and then Senior Vice President of Pollenex, "Clairol was the competitor who had gained market share from us, and they were the guy that we had to attack in the marketplace" (Gentry at 51).

15. Prior to the application for the '517 patent, the two claimed inventors, Robert Foster, Jr., and Jeff Gentry, were both aware of the Clairol FG-2 and FG-3 back massagers and that they had been on the market since more than a year prior to the application (Stip. Fact 40).

16. At the time of the conception and development of the claimed patented invention, in evaluating competitive back massagers, Mr. Gentry decided he liked the Clairol massager design for several reasons. During his deposition, when asked which of the competing massagers he preferred at the time of this evaluation, Mr. Gentry mentioned only the Clairol unit (Gentry at 35–40).

17. On or before November 17, 1988, at Mr. Gentry's direction, Robert Foster, Jr., a Pollenex engineer, disassembled the Clairol FG-3 back massager and wrote an evaluation of the unit for John Kabat, vice president of international purchasing (Gentry at 39, 41; Foster at 121–22; Def.Exh. 222). At about the same time, Messrs. Foster and Gentry orally discussed the Clairol unit (Foster at 171). The FG-3 contained DC vibrator motors and a DC heating element and an internal adapter allowing AC operation.

18. By November 17, 1988, at Pollenex/Associated Mills, Robert Foster, Jr. had disassembled an FG-3 back massager and sent a written evaluation of the unit to Jeff Gentry (Stip. Fact 34).

19. The invention defined by the claims of the '517 patent was conceived on November 17, 1988 (Stip. Fact 35).

20. At some time, Mr. Foster also examined the FG-2 (Foster at 81–83).

21. Although Messrs. Foster and Gentry claim that there were evaluations made of other competitive back massagers (Gentry at 42; Foster at 81–83), there is no documentary evidence of any such evaluations except of the Clairol back massager.

22. During the design and development of the B600 massager by Pollenex, its internal documents continually reference the features of the Clairol back massager as design benchmarks, and the documents do not reference any other competing product.

23. On December 14, 1988, Mr. Kabat wrote to Mr. Foster, on the subject of the DC back massager: "Re temperature rise.... temperature rise must be at least same as Clairol.... Re motors. We want motor same cost as Clairol or even cheaper. Don't over engineer. Gentry satisfied with Clairol quality so no need to pay more for better quality" (Def.Exh. 223).

24. On February 10, 1989, Mr. Gentry wrote in inter-office correspondence to Mr. Foster, enclosing the instruction manual from the Clairol FG-2, and directing that the new B600 massager must, like the Clairol FG-2, have the same "automatic shut-off feature if both upper and lower massager are engaged simultaneously" and that the heat "[m]ust be equal to or greater than Clairol output" (Gentry at 57; Def.Exh. 224).

25. On February 20, 1989, in inter-office correspondence, Mr. Gentry wrote to Messrs. Foster and Kabat, attaching labeling from the Clairol unit: "Please ensure that the NEW B600 Back Massager fully complies with the attached requirements" (Gentry at 59–60; Foster at 135; Def.Exh. 225).

26. In Mr. Foster's own words, from reviewing the Pollenex internal documents, he conceded that it "would be a logical conclusion" that Pollenex's primary concern was competing with the Clairol unit (Foster at 127), although he claims that was not true (id.); Mr. Gentry, who was Mr. Foster's superior, clearly disagreed with Mr. Foster on this point (see no. 14 supra).

27. In the course of this action, Pollenex produced product literature from its files concerning the Clairol FG-2 and the Family Practice line of back massagers (Def.Exh. 219 & 220). Mr. Foster's name is written on the first page of the FG-2 product literature (Def.Exh. 219), and he recognized the document (Foster at 157).

28. Mr. Gentry acknowledged that except for the electrical aspect of the claimed invention which allowed it to be used either in the car or in the home, "everything else about the [Pollenex] unit was a combination of something that Clairol had already combined in an existing product" (Gentry at 55). After the Clairol project engineer for the FG–1, FG–2 and FG–3 massagers acquired and disassembled a Pollenex B600 massager, he concluded that Pollenex had copied Clairol so closely that Pollenex had even copied Clairol's mistakes (Carlucci at 19).

### V. Foster and Gentry's Failure to Disclose The Prior Art Clairol FG–2 & FG–3 Massagers To The Patent Office

29. Prior to the patent application at issue, both of Messrs. Foster and Gentry had applied for and received other patents (Gentry at 19–20; Foster at 34).

30. Both Messrs. Foster and Gentry in the patent application at issue acknowledged "the duty to disclose information which is material to the examination of this application in accordance with Title 37, Code of Federal Regulations, § 1.56(a)" (Pl.Exh. 104 at 14; Foster at 151).

31. Mr. Gentry understood that he had a duty to "tell [the patent office] what you know" (Gentry at 24).

32. Mr. Gentry understood prior art to mean "Things that existed prior to the invention. . . . Things material, things that relate to the invention" (Gentry at 23).

33. Mr. Foster understood prior art to "also apply to products that had been produced" (Foster at 49).

34. In connection with previous patent applications, Mr. Foster had provided to the patent attorneys involved "[a]ll of the information that I felt was relevant to the concept, design and development of this product that I had in my files", "basically the file information on the project"; "it has been my practice to disclose all the information about a particular concept that I have in applying for an invention to the patent attorney who does the application" including existing products "that I would consider relevant . . . [i.e.] [i]f the principles involved in the concept in

question are similarly related in nature to the particular idea" (Foster at 44, 46–48, 63).

35. In connection with a previous patent application, Mr. Foster disclosed to the patent attorney the closest existing product, another Pollenex product, although the existing product and the claimed invention were "totally different", as well as information about products that competed with the existing Pollenex product (Foster at 54–55). He considered that disclosing "[o]ne or two products that are out there already is sufficient" (Foster at 56).

36. In connection with other patent applications, Mr. Foster disclosed to Mr. Whitesel information about existing products on the market of the same type (Foster at 64, 68, 70).

37. In connection with another patent application, Mr. Foster supplied Mr. Whitesel with publications concerning other such products, including a manufacturer's specification for one such product (Foster at 70–72).

38. During the course of the patent application at issue, Mr. Foster does not think that he supplied Mr. Whitesel with the Clairol products or the product literature, he does not recall informing Mr. Whitesel about the Clairol products, and did not discuss with anybody whether the Clairol product should be disclosed (Foster at 108, 124, 152, 170–173).

39. Mr. Foster's explanation for not disclosing the Clairol product was "[b]ecause there were numerous other products that we had considered" (Foster at 179).

40. Mr. Gentry, in a telephone conversation with Warren Whitesel, Pollenex's patent attorney, regarding the patent application at issue, discussed the massagers he had seen around the world, and listed all of the products of which he was aware, including trade names. Mr. Gentry also believes he mentioned to Mr. Whitesel that Clairol had a back massager on the market, but does not recall whether he made clear that the Clairol back massager has all of the same characteristics or elements of the claimed invention other than the ability to use it in both the home and the auto as sold, and does not recall whether he gave any consideration to

showing Mr. Whitesel any of the existing products (Gentry at 56, 61). The essence of what he disclosed to Mr. Whitesel is contained in column 1, lines 7–21 of the patent at issue, which Mr. Gentry believed fulfilled his duty of disclosure (Gentry at 56, 63).

41. Mr. Whitesel, the attorney who prosecuted the patent application at issue, had at the time approximately forty years of experience as a patent attorney after two years as a patent examiner (Whitesel at 6).

42. Mr. Whitesel had discussed the duty of candor/duty of disclosure many times with Messrs. Foster and Gentry prior to the application at issue (Whitesel at 12–14).

43. Mr. Whitesel did not become aware of the Clairol products until the start of this litigation (Whitesel at 14). He has not physically examined a Clairol back massager or seen any product literature (Whitesel at 17–18).

44. In the course of preparing the patent application at issue, Mr. Whitesel remembers a telephone conversation with Messrs. Foster and Gentry that is summarized in the disclosure of the prior art contained in the patent (col. 1 at 7–45). Mr. Whitesel, in contrast to Mr. Gentry's recollection, does not recall that any specific manufacturer's products or trade names were mentioned (Whitesel at 15–16). Pollenex did not supply any existing products or information beyond what is summarized in the patent (Whitesel at 23).

45. In connection with the patent application at issue, Mr. Whitesel did not file a separate information disclosure statement beyond the disclosure he wrote into the text of the proposed patent (Whitesel at 32–33).

## VI. *During Prosecution of The Patent Application The Patent Office Was Deceived Because Foster and Gentry Failed To Disclose The Clairol FG–2 & FG–3 Massagers*

46. The original claim 1 of the patent application in issue as filed was directed to a massager having a cushion with at least one vibrator, a control unit to apply power to the vibrator, and a jack on the control unit to receive either an AC adapter or a DC adapter (Pl.Exh. 104 at 10).

47. The original claim 1 of the patent application in issue was rejected by the U.S. Patent Office examiner under 35 U.S.C. § 103 as obvious in view of a combination of three cited references, i.e. Kawakami (Def.Exh. 205) or Muncheryan (Def.Exh. 208) combined with Bentley (Def.Exh. 209) and Geldmacher (Def.Exh. 206), the examiner stating:

> The patents to Kawakami and Muncheryan disclose a massager cushion having a control unit and connected to different electric sources. The patents to Bentley teaches the expedient of providing inflating means in a cushion to make it as firm as desired and the patent to Geldmacher discloses the provision of heating means in a cushion for therapeutic purposes. In view of the above teachings to provide the cushion of Kawakami and Muncheryan with inflating means to make the cushion as firm as desired as taught by Bentley and to provide heating means as suggested by Geldmacher would have been of no patentable moment but an obvious matter of choice on the part of a person having ordinary skill in the art as involving nothing more than utilizing well known devices for their intended purpose (Pl.Exh. 104 at 23, 24).

48. In seeking reconsideration and allowance of the patent application, Mr. Whitesel narrowed claim 1 by including several features, all of which were features of the Clairol FG–2 & FG–3 units, namely: two vibrators, one upper and lower, the ability to energize the vibrators at either a high or low setting, an air bladder in the lumbar region, and a means for selectively adjusting the inflation of the air bladder (Pl.Exh. 104 at 27).

49. Mr. Whitesel then argued to the patent office:

> The claims are drawn to an application for an automobile seat. The claims now require two vibrator motors, means for operating them at either a high or a low level, and an air bladder which may provide an adjustable degree of firmness. The system may operate on either AC or DC.

*The cited art shows only a collection of bits and parts* which have been *assembled from here and there* with the benefit of hindsight growing out of applicants' teaching. That amounts to a citation of applicants' own invention as if it were prior art. A line of cases from the CAFC indicate that before patents may be combined under these circumstances, some inducement for making the combination must be found in the prior art.

Even if, somehow, the cited art is combined as suggested by the Examiner, the claimed invention is not shown. There is no showing of the combination of upper and lower vibrators, of AC/DC operation, or of an air bladder (Emphasis added) (Pl.Exh. 104 at 27–28).

50. In response to the obviousness rejection of the original '517 patent claims, Pollenex did not argue that the jack for receiving at least two adapter means in combination with the other elements of the original claim was patentable (Pl.Exh. 104).

51. Among the patents cited for the rejection were Kawakami ('430) for a massaging device, which states: "A further object of the present invention is to provide the massaging device of the above described type which can be operated with an electrical power of low voltage available, for example, from a power outlet for hand lamp or cigarette-lighter usually provided in the automotive vehicle ... The massaging device of the present invention can be intended for use in home [*sic* ]. In this case, the use of an AC–DC converter ... is recommended...." (Def.Exh. 205 at col. 1, lines 59–65, and col. 4, lines 26–32).

52. The use of massagers with adapters for AC home operation or DC car operation was well known in view of Kawakami and also in view of the Jefferson '624 patent (Def.Exh. 212).

53. The Jefferson '624 patent states "It is contemplated that the [heating pad and massager] may be powered directly by common household alternating current or, by means of an adapter, (not shown) by twelve-volt automotive power. Such adapters are well known in the art and will not be described here" (Def.Exh. 212, Col. 2, lines 26–30).

54. The Clairol FG–2 and FG–3 back massagers contain all of the combination of elements of claim 1 except for a jack in the control unit to receive either the AC adapter of FG–3 or the DC adapter of FG–2 (Def.Exh. 201, 203).

55. None of the references cited by the Plaintiff to the Patent Office alone disclose all of the combination of elements of claim 1 except for a jack in the control unit to receive either an AC adapter or a DC adapter (Pl. Exh. 104 at 23, 24).

56. The Clairol FG–2 and FG–3 back massagers are more pertinent to the combination of elements of claim 1 than any of the Patent Office cited references.

57. Thus, the failure to disclose the Clairol FG–2 and FG–3 products, especially in light of the arguments of Pollenex's patent counsel in seeking reconsideration and allowance after the initial rejection, misled the patent office into believing that three or more references had to be combined to achieve the combination of elements in claim 1; nonetheless, the Clairol FG–2 and FG–3 back massagers contained all of the elements except alternate AC/DC operation, and the Kawakami patent taught the combination of a massager with auto-DC/home-AC operation.

58. Finally, the assertion that Messrs. Foster and Gentry did not think the Clairol products were relevant because the actual invention was the dual adapter/single jack feature of the '517 patent is not credible. If this dual adapter/single jack feature was so valuable and perceived as so unique, presumably it would have been patented all by itself.

### CONCLUSIONS OF LAW

██ Inequitable conduct before the Patent and Trademark Office renders the entire patent unenforceable. *LaBounty Mfg., Inc. v. U.S. International Trade Commission,* 958 F.2d 1066, 1070 (Fed.Cir.1992). Such a finding requires proof by clear and convincing evidence of (1) material prior art or other information that was not disclosed to the Patent Examiner and (2) an intent on the part of the applicant to mislead the examiner.

*Kingsdown Medical Consultants, Ltd. v. Hollister, Inc.,* 863 F.2d 867, 872 (Fed.Cir. 1988), *cert. denied,* 490 U.S. 1067, 109 S.Ct. 2068, 104 L.Ed.2d 633 (1989).

In defining the duty to disclose information material to patentability, the Code of Federal Regulations provides in relevant part:

(a) A patent by its very nature is affected with a public interest. The public interest is best served, and the most effective patent examination occurs when, at the time an application is being examined, the Office is aware of and evaluates the teachings of all information material to patentability. Each individual associated with the filing and prosecution of a patent application has a duty of candor and good faith in dealing with the Office, which includes a duty to disclose to the Office all information known to that individual to be material to patentability as defined in this section.... The Office encourages applicants to carefully examine:

.    .    .    .    .

(2) the closest information over which individuals associated with the filing or prosecution of a patent application believe any pending claim patentably defines, to make sure that any material information contained therein is disclosed to the Office.

(b) Under this section, information is material to patentability when it is not cumulative to information already of record or being made of record in the application, and

(1) It establishes, by itself or in combination with other information, a prima facie case of unpatentability of a claim; or

(2) It refutes, or is inconsistent with, a position the applicant takes in:

(i) Opposing an argument of unpatentability relied on by the Office, or

(ii) Asserting an argument of patentability.

37 C.F.R. 1.56.

## I. *Materiality*

■ The first element of an inequitable conduct charge, materiality, may be established "by a showing that a reasonable examiner would consider the withheld prior art important to deciding whether to issue the patent." *Merck & Co. v. Danbury Pharmacal, Inc.,* 873 F.2d 1418, 1421 (Fed.Cir.1989). Materiality is also established by a showing that the withheld prior art reference refutes, or is inconsistent with, a position the applicant took in opposing an argument of unpatentability relied on by the Patent Office. *See* 37 C.F.R. 1.56(b)(2). "When weighing whether uncited prior art is more material than that before the examiner, a trial court considers similarities and differences between prior art and the claims of the patent." *Halliburton Co. v. Schlumberger Technology Corp.,* 925 F.2d 1435, 1441 (Fed.Cir.1991).

■ In the case at bar, the Clairol FG–2 and FG–3 were highly material and non-cumulative. After the PTO's initial rejection of the patent application, the applicant narrowed claim 1 by including several features, all of which were features of the FG–2 and FG–3 units. The FG–2 and FG–3 were particularly material since the applicant subsequently argued to the PTO that the prior art cited by the PTO "shows only a collection of bits and parts which have been assembled from here and there with the benefit of hindsight" (Pl.Exh. 104 at 27–28). Hence, since the Clairol products disclose a combination of features not disclosed by the cited prior art, they are inconsistent with the applicant's position before the PTO. *See* 37 C.F.R. 1.56(b)(2)(i). Moreover, the FG–2 and FG–3 were the "closest information" known to Messrs. Foster and Gentry over which the claimed invention patentably defined. *See* 37 C.F.R. 1.56(a)(2). Furthermore, each of the Clairol products disclosed "more relevant features" than any of the patents cited by the Patent Office. For all of these reasons, the Clairol products were highly material to the patentability of the claimed invention and non-cumulative of the prior art before the PTO.

## II. *Intent*

■ In determining inequitable conduct, "[t]he more material the omission, the less culpable the intent required, and vice versa." *Halliburton,* 925 F.2d at 1439. "Direct proof of wrongful intent is rarely available but may be inferred from clear and convincing evi-

dence of the surrounding circumstances." *LaBounty*, 958 F.2d at 1076. "It is most often proven by 'a showing of acts the natural consequences of which are presumably intended by the actor.'" *Merck & Co.*, 873 F.2d at 1422, quoting *Kansas Jack, Inc. v. Kuhn*, 719 F.2d 1144, 1151 (Fed.Cir.1983). As the Federal Circuit recently explained:

"No single factor or combination of factors can be said always to *require* an inference of intent to mislead; yet a patentee facing a high level of materiality and clear proof that it knew or should have known of that materiality, can expect to find it difficult to establish 'subjective good faith' sufficient to prevent the drawing of an inference of intent to mislead. A mere denial of intent to mislead (which would defeat every effort to establish inequitable conduct) will not suffice in such circumstances."

*LaBounty*, 958 F.2d at 1076, quoting *FMC Corp. v. Manitowoc Co.*, 835 F.2d 1411, 1416 (Fed.Cir.1987). "Close cases should be resolved by disclosure, not unilaterally by the applicant." *LaBounty*, 958 F.2d at 1076.

In the case at bar, the surrounding circumstances, which are either uncontested or shown by clear and convincing evidence, clearly "infer a culpable intent to mislead or deceive the PTO." *Id.*

First, Pollenex's intent from the inception of its B600 back massager project was to attack the Clairol FG–2 and FG–3 products because they had taken market share from Pollenex's existing line of back massagers.

Second, prior to any claimed invention, the inventors were aware of both the FG–2 and FG–3 products, and indeed had disassembled and evaluated an FG–3 before conceiving their claimed invention. In fact, their claimed invention was *conceived on the day that Mr. Foster reported the results of his evaluation of the FG–3 after disassembling it*. In similar circumstances, courts have held that when inventors were "intimately involved in the evaluation of [a non-disclosed] device", such involvement is part of the "evidence establishing the inventors' intent to deceive the PTO." *Lamb–Weston, Inc. v. McCain Foods, Inc.*, 818 F.Supp. 1376, 1394 (E.D.Wash.1993).

Third, Pollenex's design and development of the claimed invention continually utilized the Clairol design and features as a benchmark. Moreover, the later designed Pollenex massager bears striking resemblance to the Clairol products in both internal circuit design and external product appearance.

Fourth, although the inventors claim that there was no particular focus on the Clairol products as opposed to other competing massagers, Pollenex's internal documents, which do not mention any other competing massager, and other testimony of Mr. Gentry, in which he said that Clairol was "the guy we had to attack in the marketplace", belie this assertion. This clear and convincing evidence further establishes Pollenex's knowledge of the importance and materiality of Clairol's products to the '517 patent application.

■ Fifth, Mr. Whitesel had on a number of occasions prior to the application at issue discussed with Messrs. Foster and Gentry their duty of disclosure. *Id.* at 1395. The duty of disclosure extends throughout the patent's entire prosecution history. *Fox Industries Inc. v. Structural Preservation Systems, Inc.*, 922 F.2d 801, 803 (Fed.Cir.1990). Furthermore, Mr. Foster knew he had a duty to disclose information because he had routinely disclosed in connection with prior patent applications at least the one product known to him to be the closest to the claimed invention, even when this product was "totally different" than the claimed invention, and also all of the information in his project files. He did not disclose the Clairol products or the product literature that was in a file that bore his name, although each included all of the elements of the claims at issue except one (AC-home/DC-auto capability) and were products his superior, Mr. Gentry, continually referenced in directing Mr. Foster's design work. In light of these facts, Mr. Foster's attempted explanation of the nondisclosure of the Clairol products and product literature is not credible. *Lamb–Weston*, 818 F.Supp. at 1395 n. 26.

Sixth, Mr. Foster and Mr. Gentry were fully aware of their duty to disclose all material prior art to the Patent and Trademark Office pursuant to 37 C.F.R. ¡1.56(a) when

they signed the declaration in support of the '517 patent application. *Id.* at 1395.

Seventh, Mr. Foster did not disclose the Clairol products or product literature to his attorney, Mr. Whitesel, or directly to the Patent Office. Mr. Gentry discussed competing back massagers that he considered prior art with Mr. Whitesel, but none of them was disclosed in the application. Mr. Whitesel denies that either inventor disclosed to him the Clairol products and the product literature.

Finally, Mr. Whitesel, in making his "bits and parts" argument for reconsideration and allowance of the claims, emphasized a combination of features, all but one of which were shown in combination by the un-cited Clairol products, and all of which were shown by combining the Clairol products with merely one other of the patents cited by the Examiner in his initial disallowance.

As in *LaBounty,*

"[h]ad [the Clairol] prior art devices been disclosed to the PTO, the conclusion is inescapable that the prosecution would not have focused merely on the [cited patents] which did not have the critical [combination of] feature[s]. Thus, the evidence amply supports an inference that [Pollenex] acted with culpable intent to mislead or deceive the PTO by withholding its ... known prior art devices and by making an argument for patentability which could not have been made had the art been disclosed."

*LaBounty,* 958 F.2d at 1076.[1]

Accordingly, in light of the high materiality of the withheld prior art, as well as the amply supported inference of culpable intent to mislead or deceive the PTO, the '517 patent is unenforceable due to inequitable conduct during the patent's prosecution.

Finally, the Defendants assert (with scant citations in support, but no response by the Plaintiff), that the inequitable conduct of the patentee makes this an "exceptional case" entitling Defendants to their attorneys' fees, disbursements and costs pursuant to 35

U.S.C. § 285. Because this argument warrants full and thorough consideration, the Plaintiff is hereby ordered to submit a written response to this argument within 14 days, and the Defendants are to file a reply 7 days thereafter.

### CONCLUSION

For the foregoing reasons, the court hereby enters judgment in favor of the Defendants on the grounds of inequitable conduct, and hereby orders the Plaintiff to submit a written response to the Defendants' request for attorneys' fees, disbursements and costs within 14 days. The Defendants are to file a reply 7 days thereafter.

---

1. Nevertheless, the evidence is not sufficient to establish the complicity of Pollenex's patent counsel in the deception of the PTO because he never saw the Clairol products nor had an understanding of the combination of features they showed.