Robert M. **SINSKEY**, Plaintiff–
Appellant,

v.

**PHARMACIA OPHTHALMICS,
INC.**, Defendant–Appellee.

No. 92–1216.

United States Court of Appeals,
Federal Circuit.

Dec. 28, 1992.

---

Ronald W. Reagin, Blakely, Sokoloff, Taylor & Zafman, of Los Angeles, CA, argued for plaintiff-appellant. With him on the brief was Stephen D. Gross.

David J. Oldenkamp, Poms, Smith, Lande & Rose, of Los Angeles, CA, argued for defendant-appellee. With him on the brief were William Poms and Brian W. Kasell. Also on the brief was Robert Stier, Jr., Bernstein, Shur, Sawyer & Nelson, of Portland, ME.

Before ARCHER, MAYER and MICHEL, Circuit Judges.

MAYER, Circuit Judge.

Robert M. Sinskey appeals the judgment of the United States District Court for the Central District of California holding that United States Patent No. 4,601,720 is invalid under 35 U.S.C. § 102(b). Because we agree with the district court that Sinskey has not raised a genuine issue as to any material fact and that Pharmacia Ophthalmics, Inc. is entitled to judgment as a matter of law, we affirm.

## BACKGROUND

Dr. Robert M. Sinskey is the named inventor and sole owner of the patent in suit, United States Patent No. 4,601,720 (the '720 patent). On February 20, 1990, Sinskey filed a complaint alleging infringement of the '720 patent by Pharmacia Ophthalmics, Inc. Pharmacia filed a motion for summary judgment on April 29, 1991, asserting that claims 1, 5 and 6 of the '720 patent were invalid under 35 U.S.C. § 102(b) based upon the public use and sale of the claimed invention by Sinskey and IOLAB Corporation. Sinskey had filed his patent application on February 24, 1981, making the critical date for the use and sale inquiry February 24, 1980. In opposing the motion, he asserted that all pre-critical date activity was for experimental purposes and could not be the basis for a bar under section 102(b). In a July 16, 1991, order, the district court granted summary judgment, holding that Sinskey raised no genuine issue of material fact about the defense of experimental use. This is his appeal of that order.[1]

The patent is directed to an intraocular lens (IOL). IOL's are commonly implanted in the human eye to restore or improve the vision of patients who have had their natural lens removed because of damage or disease. An IOL consists of a transparent lens several millimeters in diameter, and loops or "haptics" joined to the lens. The loops retain the lens in the proper position in the eye.

In 1977, an IOL invented by Dr. Stephen P. Shearing became available. This lens is commonly referred to as the "Shearing" or "J-Loop" lens. Sinskey implanted approximately 1,000 Shearing lenses between 1977 and 1979. The Shearing lens was manufactured and sold by IOLAB as its Model 101 lens. Another IOL available in the late 1970's was designed by Dr. William Simcoe. The "Simcoe" lens had continuously curved C-shaped loops. *See generally Shearing v. Iolab Corp.*, 975 F.2d 1541, 24 USPQ2d 1133 (Fed.Cir.1992) (discussing the state of the IOL art in the 1960's and 1970's and the early work of Dr. Shearing and Dr. Simcoe). Sinskey was also aware of the Simcoe lens, which had softer loops than the Shearing lens, but he never implanted any of them.

Sinskey testified under oath in a deposition on January 10, 1991, that he saw problems with the prior art IOL's. Specifically, there was a risk of injury due to the loops of the lens piercing the interior of the patient's eye during implantation. Sinskey sought to solve this problem by attempting a compromise between the Shearing J-Loop and the Simcoe C-Loop lenses. In November of 1979, he first thought of using a modified J-loop, having a shape somewhere between those of the other two lens designs. He presented his idea to IOLAB, who had its engineers prepare an engineering drawing of the lens. The lens was designated Model 103J and was added to IOLAB's existing collection of lenses on November 16, 1979. Sinskey has admitted that the Model 103J lens is the invention of claims 1, 5 and 6 of the '720 patent. By late December, 1979, IOLAB produced the first sterile Model 103J lenses which were ready for implantation into patients. IOL-

---

1. In another order dated January 15, 1992, the district court granted Pharmacia summary judgment, holding that claims 2, 3 and 4 of the '720 patent were invalid under 35 U.S.C. § 103 as obvious in light of the prior art, including Sinskey's and IOLAB's pre-critical date activity.

Sinskey has conceded that if we affirm the July 16 order that this activity was not experimental use, and therefore was prior art under section 102(b), then claims 2–4 are invalid under section 103.

AB made the Model 103J lenses in the same way and with the same materials as the Shearing Model 101 lenses.

Sinskey first successfully implanted the Model 103J lens into a patient's eye on January 17, 1980, and between February 7 and 18, 1980, he implanted seven more Model 103J lenses in seven additional patients. Thus, a total of eight Model 103J lenses were implanted prior to February 24, 1980, the critical date. All eight implantations took place at St. John's Hospital, Santa Monica, California, under normal conditions and following standard hospital procedures.

IOLAB's computerized record summaries show that IOLAB sold Sinskey at least three separate Model 103J lenses, pursuant to an invoice dated January 18, 1980. The records show the lenses were sold for $250 apiece and payment was received in full. IOLAB sales records also show that three Model 103J lenses were ordered on January 15, 1980, and that one of the lenses was shipped February 11, 1980, and invoiced for $250 on February 12, 1980. Another IOLAB sales document indicates that Sinskey ordered 25 Model 103J lenses on February 19, 1980.

On March 17, 1980, after Sinskey implanted three more Model 103J lenses, for a total of eleven, IOLAB first offered the Model 103J lens for sale commercially to other ophthalmologists. IOLAB continued to sell Model 103J lenses for $250 each, with over 3,400 sold between March 17, 1980, and March 27, 1981.

## DISCUSSION

The first question is the propriety of summary judgment which we decide for ourselves. We are not bound by the district court's ruling that there was no genuine issue of material fact to prevent judgment for Pharmacia as a matter of law. *Armco, Inc. v. Cyclops Corp.*, 791 F.2d 147, 149, 229 USPQ 721, 723 (Fed.Cir.1986).

The facts set out above are not in dispute. The only issue is the purpose for which the pre-critical date implantations were made. The burden was on Sinskey to present some evidence that would raise a genuine issue of material fact over his allegation of experimental use. He argued that his declaration in opposition to defendant's motion for summary judgment does that. The district court agreed that the declaration was in direct conflict with Sinskey's previous testimony at the deposition, but held that this conflict did not raise a genuine issue of material fact.

Sinskey had testified under oath in the deposition that no testing of the Model 103J lens was required.[2] He made statements to the effect that he believed the lens would work and that the lens was not significantly different from the Shearing lens which he had implanted on hundreds of occasions in the past. And he testified that, after the first implantation, he felt sure the Model 103J lens would work and that there was no need for any further tests.

In the declaration, on the other hand, Sinskey said he considered the first eleven implants of the Model 103J lens to be experimental.[3] These assertions directly con-

2. The particular portion of Sinskey's deposition relied upon by the district court reads as follows:

Q. Were there any animal tests after they were sterilized?
A. Not that I remember.
Q. You didn't indicate that they had to be tested?
A. No.
Q. In any way?
A. No, it looked pretty obvious to me what should be done.
Q. What was it obvious that had to be done?
A. I thought it was great myself and I couldn't wait to put them in people.

Q. You knew they were going to work right away, didn't you?
A. Right.
Q. So you didn't feel they had to do any running of tests?
A. No, because it was basically—it wasn't that markedly different ...

3. Discussing the first implantation Sinskey stated in the declaration:
While I was satisfied with the performance of the lens in this particular implantation, I still *could not be sure that the lens was going to work in all implantation surgeries....* I therefore needed to perform additional tests in order to insure that the lens would consistently work well....

flict with the deposition statements that he did not believe the lens required testing. There is no explanation for the facial inconsistency, and the declaration does not attempt to reconcile the conflict; indeed, it does not address Sinskey's deposition testimony at all.

■ A party cannot create an issue of fact by supplying an affidavit contradicting his prior deposition testimony, without explaining the contradiction or attempting to resolve the disparity. *See, e.g., Martin v. Merrell Dow Pharmaceuticals, Inc.*, 851 F.2d 703, 706 (3d Cir.1988); *Mack v. United States*, 814 F.2d 120, 124 (2d Cir.1987); *Franks v. Nimmo*, 796 F.2d 1230, 1237 (10th Cir.1986). Where, as here, a party has been examined extensively at deposition and then seeks to create an issue of fact through a later, inconsistent declaration, he has the duty to provide a satisfactory explanation for the discrepancy at the time the declaration is filed. To allow him to preclude summary judgment simply by contradicting his own prior statements would seriously impair the utility of Federal Rule of Civil Procedure 56. The trial court properly disregarded the declaration in assessing the existence of a genuine issue of fact.

■ The statutory presumption of validity under 35 U.S.C. § 282 puts the burden of proving invalidity on the party asserting it and the burden never shifts to the patentee. *Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1534, 218 USPQ 871, 875 (Fed.Cir.1983). But where experimental use is raised to defeat a claim of anticipation under 35 U.S.C. § 102(b), the patentee is not wholly relieved of obligation. According to *T.P. Laboratories, Inc. v. Professional Positioners, Inc.*, 724 F.2d 965, 971, 220 USPQ 577, 582 (Fed.Cir.1984), the court must look to the totality of the circumstances to determine whether there

has been a public use within the meaning of section 102(b). On summary judgment, once an alleged infringer has presented facts sufficient to establish a *prima facie* case of public use, it falls to the patent owner to come forward with some evidence to the contrary sufficient to raise a genuine issue of material fact. *Harrington Mfg. Co. v. Powell Mfg. Co.*, 815 F.2d 1478, 1480, 2 USPQ2d 1364, 1367 (Fed.Cir.1986).

Pharmacia has put forth evidence establishing the eight pre-critical date implantations and the sale by IOLAB of at least three Sinskey lenses. Sinskey did not contest these facts; in fact, he admitted them in Pharmacia's initial request for admissions. Pharmacia has thus met its burden of establishing a *prima facie* case of invalidity under section 102(b) because the patented lenses were in public use or on sale more than one year before the patent application was filed. It was then incumbent on Sinskey to put forth some evidence in rebuttal to support his claim of experimental purpose.

■ To establish that an otherwise public use or sale does not run afoul of section 102(b), it must be shown that the activity was "substantially for purposes of experiment." *Baker Oil Tools, Inc. v. Geo Vann, Inc.*, 828 F.2d 1558, 1564, 4 USPQ2d 1210, 1214 (Fed.Cir.1987). Objective evidence such as the length of the test period, whether payment was made for the device, whether there was a secrecy agreement, whether progress reports were kept, whether someone other than the inventor conducted the experiments, and the overall number of tests may be considered. *See T.P. Laboratories*, 724 F.2d at 971, 220 USPQ at 582.

■ As we have seen, Sinskey's only rebuttal evidence was the declaration in opposition to summary judgment proclaiming that the implantations were intended to

Referring to the first eleven implantations, he said,

I considered those eleven implantations ... to be experimental. I wanted to determine whether my new lens design would be easier and safer to implant than the Shearing lens and whether it would minimize the risk of damage to the zonules and capsule. In order

to accomplish this test, I knew I would have to implant the lenses in a number of patients.... It was only after these eleven implantations were successfully completed that I would be sure that my new design both minimized the risk of zonular and capsular damage while still providing sufficient support for the lens.

be experimental, which was inconsistent with his deposition statement that he did not believe the lens needed to be tested. Sinskey argues here that his deposition is not inconsistent with his later declaration. He says that together they raise a genuine issue of material fact with regard to the alleged experimental purposes of the pre-critical date implantations. Sinskey argues that the implantations themselves were the required tests, and that he was never asked at deposition the purpose of the implantations, or how many would be necessary before he would be satisfied the lens was safe and effective. Even if the declaration could somehow be interpreted as consistent with the deposition, however, Sinskey still could not forestall summary judgment because after-the-fact testimony of an inventor's subjective "experimental intent" is entitled to minimal weight. *In re Smith,* 714 F.2d 1127, 1135, 218 USPQ 976, 983 (Fed. Cir.1983). "[I]f a mere allegation of experimental intent were sufficient, there would rarely if ever be room for summary judgment based on a true 'on sale' defense under 35 U.S.C. § 102(b)." *D.L. Auld Co. v. Chroma Graphics Corp.,* 714 F.2d 1144, 1150, 219 USPQ 13, 17 (Fed.Cir.1983). Besides, both his deposition and his declaration occurred more than a decade after the activities at issue. Post-hoc affidavit testimony alone, years after the events described and purporting to show an inventor's subjective experimental intent, will never satisfy the burden of establishing experimental use in a case like this where there is no contemporaneous evidence of experimental purpose and the objective evidence is to the contrary. *See Harrington Mfg. Co.,* 815 F.2d at 1481 n. 3, 2 USPQ2d at 1366 n. 3.

The objective evidence in this case cuts heavily against experimental use. Sinskey charged his usual surgical fee of $1,900 for each of the eight operations and IOLAB charged its standard $250 price for the lenses. He did not inform the patients that they were being treated with a "new" or "experimental" lens, nor did he obtain any kind of secrecy agreement from the patients or surgical staff. None of the documents provided by IOLAB or Sinskey ever referred to the Model 103J as "experimental" or the subject of tests. Apparently routine medical records of these implantations were kept, but Sinskey does not refer to them specifically, and they were not put before the district court. If they contained any indication that the implantations were part of an experimental or test program, rather than routine operations, it is fair to assume Sinskey would have offered them. Besides, in its Pre–Market Approval Application to the FDA, IOLAB characterized the Sinskey lens as "equivalent in design, use and function to the Shearing ... Lenses" and requested that it be "approved at this time as a supplement to the Shearing" lenses.

Sinskey also provided no evidence contemporaneous with the initial eight implant operations that would corroborate his claims that they were for experimental purposes. Even evidence of his subjective intent at the time of the implantations was absent from the record. It is logical to expect that if an inventor set out to test a new device, there would be some contemporaneous evidence about the success or at least the occurrence of the tests. One would expect some note at the time that the test was, or was not, successful. In an invention that was part of a medical procedure, the inventor might have made some notation in the medical records about the use of the experimental device. Here there was no contemporaneous evidence at all, subjective or otherwise, that might indicate the existence of tests or an experimental program. Nothing else Sinskey raises persuades us an error was committed.

## CONCLUSION

Accordingly, the judgment of the United States District Court for the Central District of California is affirmed.

AFFIRMED.