David A. McGUIRE, M.D. and E. Marlowe Goble, M.D., Plaintiffs,

v.

ACUFEX MICROSURGICAL, INC., Defendant.

Civ. A. No. 93–11265–RCL.

United States District Court, D. Massachusetts.

Nov. 10, 1994.

James E. McGuire, Steven D. Pohl, Brown, Rudnick, Freed & Gesmer, Boston, MA, for plaintiffs.

Robert C. Cadle, Fordham & Starrett, Boston, MA, Thomas A. Mullen, Wakefield, MA, Richard C. Seltzer, Daniel P. Dinapoli, Gerard F. Diebner, Kaye, Scholer, Fierman, Hays & Handler, New York City, for defendants.

LINDSAY, District Judge.

Report and Recommendation Accepted.

### REPORT AND RECOMMENDATION RE: MOTION FOR SUMMARY JUDGMENT OF PATENT INVALIDITY UNDER 35 U.S.C. § 102(B) AND OF NON–INFRINGEMENT (DOCKET ENTRY # 26)

**October 19, 1994**

BOWLER, United States Magistrate Judge.

Pending before this court is a motion for summary judgment filed by defendant Acufex Microsurgical, Inc. ("Acufex"). (Docket Entry # 26). Plaintiffs David A. McGuire, M.D. ("McGuire") and E. Marlowe Goble, M.D. ("Goble") (collectively: "plaintiffs"), co-inventors with W. Karl Somers ("Somers") of U.S. Patent No. 4,927,421 ("the '412 patent") oppose the motion. (Docket Entry # 32).

On June 1, 1994, this court held a hearing, admitted certain exhibits into the record and took the motion for summary judgment (Docket Entry # 26) under advisement.

### BACKGROUND

Plaintiffs filed this patent infringement action seeking injunctive relief and damages against Acufex for its manufacture and sale of a product called a "Cannu–Flex screw." (Docket Entry # 1). The '421 patent, entitled Process of Endosteal Fixation of a Ligament, sets forth a surgical procedure to affix a ligament to a bone mass with a cannulated interference screw. It is now one of the most common surgical methods used to repair or reconstruct the anterior cruciate ligament ("ACL surgery"). (Docket Entry # 34).

Acufex' summary judgment motion is two-fold. First, Acufex argues that a March 30, 1988 ACL surgery performed by McGuire more than one year prior to the May 15, 1989 filing of the '421 patent invalidates claim 2 of the patent under 35 U.S.C. § 102(b). Plaintiffs maintain that the surgery was experimental. (Docket Entry # 32). Second, Acufex submits that its cannulated interference screw does not infringe claim 4 of the '421

patent because it lacks a drill tip to drill into a bone mass. (Docket Entry ## 27 & 39).

The '421 patent originally claimed the following:

1. A process of endosteal fixation of a ligament within the interior of a bone mass comprising, forming a ligament tunnel though adjacent bone masses; fitting a ligament under tension in said ligament tunnel, extending between said adjacent bone masses; and turning a threaded device into one end of said ligament tunnel, guiding it alongside the ligament, such that the threads of said threaded device turn into said tunnel wall and a bone block end portion of said ligament.

2. A process of endosteal fixation as recited in claim 1, wherein the threaded device is cannulated and is arranged for travel and turning along a guide wire that is fitted into the ligament tunnel, alongside the ligament.

3. A process of endosteal fixation as recited in claim 1, wherein the threaded device has a threaded body and includes a drill extending from one or a first end with an arrangement for fitting a driver formed in the other or second end.

4. A process of endosteal fixation as recited in claim 3, wherein the threaded device and driver are both cannulated to travel along a guide wire that is for fitting into the ligament tunnel, alongside the bone block end portion of the ligament.

(Docket Entry # 27, Ex. A).

In 1992, McGuire, Goble and Somers ("the patentees") sought reissuance. In so doing, they withdrew claims 1 and 3 which were not limited to cannulated screws in light of prior art, in particular, "the Kurosaka screw and method disclosed in 'Depuy 9.0 mm. Kurosaka Fixation Screw.'" The prior art, advertised in October 1987, disclosed an interference screw and a method of using the screw to create an interference fit. The prior art further included interference screws, staples or sutures over screw posts as a means to affix a ligament graft. (Docket Entry # 36, Ex. 20; Oral Argument, Ex. 5; Docket Entry # 35).

ACL surgery commonly involves drilling a tunnel through the tibia and the femur. The specification gives the example of "an anterior or posterior cruciate ligament tunnel [being] prepared in the distal femur and proximal tibia portions of a patient's knee in an arthroscopic procedure."

Using the patented procedure, the surgeon then inserts a ligament graft through the tunnel using a cannulated interference screw fitted over a guide wire. Using the guide wire avoids the problem of deflecting the interference screw away from the tunnel. Once in the proper position, the surgeon turns the interference screw in alongside the bone portion of the ligament graft thereby lodging the screw between the ligament graft and the tunnel wall to create an interference fit. (Docket Entry ## 34–36 & Ex. 18).

After speaking with Goble, McGuire, a board certified orthopedic surgeon, initially began to conceive the patent during an airplane flight to Alaska in February 1988. In a February 10, 1988 letter to Goble, McGuire included sketches he made during the airplane flight and outlined a proposal to use a bone block threaded into the femur through a reamed tunnel. He also described a back up procedure employing a cannulated, headless interference screw. (Docket Entry # 36 & Ex. 1). In a reply letter, Goble pointed out certain deficiencies in McGuire's proposal and mentioned that Somers, a manufacturing engineer, had worked on McGuire's drawings. Goble then suggested using another technique which employed a device to drill a hole through a bone plug and then insert a driver up through the bone. (Docket Entry # 36 & Ex. 2).

In late February 1988, McGuire's assistant, J.C. Campbell ("Campbell") obtained a Mecron cannulated, cancellous bone screw ("the Mecron screw"). The Mecron screw has an enlarged head which when engaged in the cortical bone and turned causes the threads to engage and compress the bone fragments. Campbell also located a cannulated drill and a guide wire. (Docket Entry # 36 & Ex. 3).

On March 30, 1988, McGuire performed ACL surgery on a patient, Jeffrey L., using the Mecron screw and a cannulated screwdri-

ver. It is undisputed that the Mecron screw is a cannulated interference screw. McGuire charged and received his normal surgical fee. He did not obtain a signed release from Jeffrey L. to engage in experimental surgery. And, when asked at his deposition whether he advised the patient that he was "about to conduct a *medical* [emphasis added] experiment," McGuire replied, "I didn't think I was." Similarly, in reply to the next question of whether his surgical notes "describe any aspect of the operation as being an experiment," McGuire stated that, "I didn't think it was."[1] McGuire also admitted that the procedure he conducted on March 30, 1988 was the same procedure described in claim 2 of the '421 patent. (Docket Entry # 36; Docket Entry # 27, Ex. B).

By affidavit, McGuire tried to limit the reach of his deposition testimony. McGuire avers that he did not regard the March 30, 1988 surgery "to be a 'medical experiment,' because the patient was not exposed to any increased risk." McGuire describes his actions as "a matter of experiment and investigational in nature" for purposes of developing a less invasive method of affixing a ligament graft. He also avers that the procedure "was not the precise procedure that [he] had conceived." (Docket Entry # 36).

The March 30, 1988 procedure was the only surgery McGuire performed using a cannulated interference screw before May 15, 1988 (one year before the May 15, 1989 filing date). While McGuire fails to produce an express agreement of confidentiality, McGuire performed the surgery with surgical assistants directly under his control. No other persons were present during the operation. (Docket Entry # 36).

The operative and post operative reports do not describe the surgery as experimental.

(Docket Entry # 36, Ex. 6 & 7). McGuire describes his post operative care of Jeffrey L. as "routine." (Docket Entry # 27, Ex. B).

Richard B. Caspari, M.D. ("Caspari"), a board certified orthopedic surgeon and past president of the Arthroscopy Association of North America, opines that McGuire's failure to obtain the patient's consent to perform trial testing is consistent with common practice. He avers that physicians generally test surgical procedures on human patients rather than animals. Even more importantly, Caspari states that the medical procedure described by McGuire was not a "medical experiment" because this alternative procedure posed less of a risk to the patient than the standard, more invasive procedure. And, in performing "such testing, only standard medical records, including records relating to follow-up visits, are commonly used." In Caspari's opinion, it is not common to keep additional or different records when performing the type of testing done by McGuire. (Docket Entry # 34).

After the March 30, 1988 operation, McGuire decided that the Mecron screw was inappropriate because of its head. McGuire preferred using a headless screw and avers that the March 30, 1988 operation "was not the precise procedure I had conceived." The claims in the '421 patent do not express a distinction or limitation between a headed versus a headless cannulated screw.[2] (Docket Entry # 27, Ex. A & B; Docket Entry # 36).

In April 1988, McGuire wrote to Goble and requested his assistance in locating a headless cannulated screw. He noted that, "We've had very excellent results so far with drilling the femoral tunnel ... and using a K-wire.... The fixation is excellent.... This is working so well that I'm becoming

---

1. The exact exchange was as follows:

    Q. You didn't tell the patient you were about to conduct a medical experiment on him, did you?

    A. I didn't think I was.

    Q. Your surgical notes don't describe any aspect of the operation as being an experiment, do they?

    A. I didn't think it was.
    (Docket Entry # 27, Ex. B).

2. At his deposition, McGuire testified that in the course of reissue proceedings he was "giving up all claim to patenting the use of a headed cannulated interference screw." McGuire also stated as follows in response to the following command:

    Q: ... Take a look at the four claims at the back of the patent.
    A: I've read them, yes. They don't say that it can't be a headed or a headless. That's true, they don't. That's easy, right?
    (Docket Entry # 27, Ex. B).

increasingly convinced that *this may be the way to do things.*" (Docket Entry # 36, Ex. 8; emphasis added).

In or around May 1988, McGuire attempted to locate and obtain a "cannulated Kurosaka screw." He also requested a headless cannulated screw from a manufacturer of medical devices in Florida. (Docket Entry # 36 & Ex. 9 & 10).

McGuire performed additional ACL surgery using a Mecron screw on June 1, 1988, and July 13, 1988. On July 14, 1988, the Florida manufacturer supplied McGuire with sample interference screws. McGuire maintained contact with Goble and Somers during this time.

In October 1988 McGuire used a headless cannulated interference screw in another ACL operation. In November 1988 McGuire successfully implanted a headless cannulated interference screw produced by Goble and Somers, featuring a self driving, self tapping lead, in a patient during ACL surgery. In February 1989 the Florida manufacturer sent McGuire additional "headless cannulated interference screws with driver" for him to evaluate. (Docket Entry # 36 & Ex. 13–16).

On May 15, 1989, the patentees filed their application for the '421 patent. The patent issued on May 22, 1990. As previously noted, in 1992 the patentees sought reissuance of the '421 patent and dropped claims 1 and 3. McGuire avers that during the reissuance process, his patent attorneys presented the Patent Examiner with every article or fact brought to their attention by Acufex as alleged grounds to invalidate the '421 patent. (Docket Entry # 36). The April 1994 Notice of Allowance contains the following statement of reasons for allowance by the Patent Examiner:

> [E]xaminer is convinced that applicant's use of the claimed method in March of 1988 was not a public use or sale under 35 U.S.C. § 102(b). Applicant supplied the following evidence that supports this finding; the operation was the first attempt to use the inventive method in a human being

and was under the strict control of the applicants, the applicants continued to work towards a 'best mode' of the (sic) their invention (the headless interference screw) during the time period after the March operation (as evidenced by the communications between the applicants), there is an assumed confidentiality agreement that arises between the patient and doctor (as evidenced in case law), and the fact that the operation was done at the same cost as the standard procedure.

(Docket Entry # 37).

Turning to claim 4 in the context of Acufex' noninfringement argument, claim 4 incorporates the procedure in claim 3 "wherein the threaded device has a threaded body and includes a drill extending from one or a first end." (Docket Entry # 36, Ex. 18; emphasis added). The specification notes that:

> Another object of the present invention is to provide a cannulated interference screw having a *drill* end for both *drilling a hole into bone mass* followed by the interference screw threads, which threads have at least one leading thread for cutting into that drilled hole.

(Docket Entry # 36, Ex. 18; emphasis added).

Gerald S. Carlozzi ("Carlozzi"), Acufex' Director of Research and Development, attests that "the Acufex screw lacks the 'drill' tip" noted in the claimed invention and "[t]he Acufex screw does not 'drill into a bone mass.'" Unequivocally stated by Carlozzi, "[t]he Acufex screw does not drill a passage through bone" or cut into bone. Instead, the Acufex screw "screws into place in the space between the bone block and the tunnel which was previously drilled with a separate drill bit." (Docket Entry # 27, Ex. D).

The attorney initially prosecuting the '421 patent, Reid Russell ("Russell"),[3] described claims 3 and 4 as having the addition of a drill end. It was also his understanding that "if the screw had threads all the way to its tip and was not designed to actually drill holes in bones, that was not the embodiment

---

3. In their opposition brief, the patentees describe Russell as the attorney who wrote and prosecut-

ed the '421 patent. (Docket Entry # 32).

[he] was describing in [c]laims 3 and 4." [4] According to Russell, "The function of the drill end was to open a passage, drill a passage," along the wire "to be followed by the screw threads." As noted above, he believed that claims 3 and 4 were not claiming an interference screw which would function without a drill end.[5] (Docket Entry # 27, Ex. E; Docket Entry # 33, Russell deposition).

Russell qualified this testimony by noting that, "A screw, when it goes into anything, is going to open a passage for itself." And, speaking about the drilling function as Russell perceived it when prosecuting the '421 patent, he testified that because a screw, when turned into something, will create a hole, then such a screw would perform a drilling function because it was forming a hole.[6] (Docket Entry # 27, Ex. E; Docket Entry # 33, Russell deposition).

Plaintiffs therefore contend that the Acufex screw, with a pointed tip, as described in an Acufex brochure (Docket Entry # 27, Ex. D(1)), pushes into the mass of bone block and the bone thereby creating a passage or an opening for the threads and, consequently, functioning as a drill. (Docket Entry # 32).

4. Russell testified that, "As I understood the patent when I prosecuted it, I showed a drill end and that's what I claimed, yes." His testimony also reads, in part, as follows:

Q. Would it be fair to say that [c]laims 3 and 4 show a screw as shown in Figure 1, and [c]laims 1 and 2 would include screws that did not have a drill end? And I'm again limiting the question to your understanding when you were prosecuting the patent.
A. Yes.
Q. So then it's your understanding at the time you were prosecuting the patent that if the screw had threads all the way to its tip and was not designed to actually drill holes in bones, that was not the embodiment you were describing in [c]laims 3 and 4; correct?
A. Correct.
(Docket Entry # 27, Ex. E; Docket Entry # 33, Russell deposition).

5. Russell also testified as follows:

Q. Could you describe to me how an interference screw would function without having a drill end on it?
A. An interference screw would be turned into an area between the bone block and the

## DISCUSSION

Summary judgment is appropriate if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *accord Aponte–Santiago v. Lopez–Rivera,* 957 F.2d 40, 41 (1st Cir. 1992) (citing *Anderson,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). Disputed questions of material fact are resolved in the nonmovant's favor. *Baker Oil Tools, Inc. v. Geo Vann, Inc.,* 828 F.2d 1558, 1560 (Fed. Cir.1987). Furthermore, the summary judgment "rules do not change simply because the case involves patent law." *Aid Pack, Inc. v. Beecham, Inc.,* 641 F.Supp. 692, 694 (D.Mass.1986), *affm'd,* 826 F.2d 1071 (Fed. Cir.1987).

Acufex bases its summary judgment motion on two arguments. First, Acufex contends that McGuire's March 30, 1988 operation falls within the statutory bar of 35 U.S.C. § 102(b) ("section 102(b)"). Second, Acufex argues that its screw does not have a drill or a drill function and therefore does not infringe claim 4 of the '421 patent. The arguments are addressed *seriatim.*

end of the ligament and the ligament tunnel wall. And that's an opening. It would follow that opening, crack, if you will, and be ceded in the bone.
Q. And that, just so it's clear, is not what [c]laims 3 and 4 are claiming; right?
A. That's correct.
(Docket Entry # 27, Ex. E). He also testified that, "Anything that is construed as a drill on the end of that screw would fall within [c]laim 3." (Docket Entry # 33, Russell deposition).

6. Russell's testimony is as follows:

A. Okay. Unless there is an existing hole, when you turn a screw into, say, a piece of wood, you are going to create a hole that the screw threads go into. The leading thread is pointed and it turns into that material.
Q. Correct.
A. Now, my definition of drilling is that could be considered a drill because it is forming a hole. What was intended, what I was looking at in the patent formulation was what I had in front of me, which was definitely a drill. And it performed a drilling function to create a hole that the threads then followed into.
(Docket Entry # 33, Russell deposition).

## A. *Experimental Use*

█ Section 102(b) states that a person may not obtain a patent in the event "the invention was ... in public use or on sale in this country, more than one year prior to the date of the application." 35 U.S.C. § 102(b). Because of the statutory presumption of validity, the burden of proving invalidity falls to Acufex "and the burden *never* shifts to the patentee." *Sinskey v. Pharmacia Ophthalmics,* 982 F.2d 494, 498 (Fed.Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 2346, 124 L.Ed.2d 256 (1993) (emphasis added); *accord Greenwood v. Hattori Seiko Co., Ltd.,* 900 F.2d 238, 241 (Fed.Cir.1990); *Hybritech, Inc. v. Monoclonal Antibodies, Inc.,* 802 F.2d 1367, 1375 (Fed.Cir.1986), *cert. denied,* 480 U.S. 947, 107 S.Ct. 1606, 94 L.Ed.2d 792 (1987); *see also Lear Siegler, Inc. v. Aeroquip Corporation,* 733 F.2d 881, 885 (Fed. Cir.1984) (decision maker should begin by accepting proposition of patent's validity); *American Hoist & Derrick Co. v. Sowa & Sons, Inc.,* 725 F.2d 1350, 1360 & 1364 (Fed. Cir.), *cert. denied,* 469 U.S. 821, 105 S.Ct. 95, 83 L.Ed.2d 41 (1984); *see generally In Re Etter,* 756 F.2d 852, 858 (Fed.Cir.), *cert. denied,* 474 U.S. 828, 106 S.Ct. 88, 88 L.Ed.2d 72 (1985) (presumption does not apply during reissue and reexamination proceedings). Further, Acufex must show the existence of the "bar by clear and convincing evidence." *Manville Sales Corporation v. Paramount Systems, Inc.,* 917 F.2d 544, 549 (Fed.Cir. 1990); *accord Envirotech Corporation v. Westech Engineering, Inc.,* 904 F.2d 1571, 1574 (Fed.Cir.1990) ("party asserting the on sale bar must prove by 'clear and convincing evidence' ").

█ The critical date, determined retrospectively, *Baker Oil Tools, Inc. v. Geo Vann, Inc.,* 828 F.2d at 1563, is May 15, 1988, one year prior to the filing of the '421 patent. Where, as here, an experimental use is raised to defeat the statutory bar of section 102(b), "the patentee is not wholly relieved of obligation." *Sinskey v. Pharmacia Ophthalmics,* 982 F.2d at 498. Rather, faced with a summary judgment motion, the patentee must "come forward with some evidence to the contrary sufficient to raise a genuine issue of material fact." *Sinskey v. Pharmacia Ophthalmics,* 982 F.2d at 498; *accord Auld Company v. Chroma Graphics Corporation,* 714 F.2d 1144, 1150 (Fed.Cir.1983) (to defeat summary judgment, patentee "need not prove an experimental purpose, but must submit facts indicating an ability to come forward with evidence that such proof is possible"); *see also U.S. Environmental Products, Inc. v. Westall,* 911 F.2d 713, 716 (Fed.Cir.1990) (once alleged infringer establishes *prima facie* case, "patent holder must 'come forward with convincing evidence to counter that showing' "); *TP Laboratories v. Professional Positioners, Inc.,* 724 F.2d 965, 971 (Fed.Cir.), *cert. denied,* 469 U.S. 826, 105 S.Ct. 108, 83 L.Ed.2d 51 (1984) (after *prima facie* showing, patentee must "point to or must come forward with convincing evidence to counter that showing").

█ This court finds that Acufex met its *prima facie* showing by demonstrating that on March 30, 1988, McGuire performed an operation using a cannulated interference screw and screwdriver on a patient for his normal fee without obtaining a release that the operation was experimental. Further, McGuire's deposition testimony, despite the subsequent explanation and Caspari affidavit, also supports Acufex' *prima facie* showing.[7] Hence, the burden of coming forward with evidence to the contrary falls on the patentees. *See, e.g., Auld Company v. Chroma Graphics Corporation,* 714 F.2d at 1150 (alleged infringer having shown *prima facie* case, it therefore fell to patentee to submit contrary evidence to defeat summary judg-

---

7. In addition, such evidence also establishes that summary judgment in favor of the patentees is not warranted.

Although neglecting to title their opposition pleading as a cross motion for summary judgment, two sentences in the patentees' opposition pleading urge summary judgment in their favor on the issue of experimental use. (Docket Entry # 32, pp. 9 & 14). Their argument, however, focuses on opposing summary judgment in Acufex' favor. Mindful of the different standard of review afforded a cross motion for summary judgment and having considered the statutory presumption of validity and assessed the pertinent factors, summary judgment in the patentees' favor is improper. The issue of experimental use should go to the jury.

ment). The burden of persuasion does not, however, shift at any time to the patentees. And, the single and predominant issue facing this court is not whether the March 30, 1988 operation was experimental but whether there was a public use or sale under section 102(b) as a matter of law. *TP Laboratories v. Professional Positioners, Inc.*, 724 F.2d at 971.

■ It is important to recognize that McGuire's self serving affidavit (Docket Entry # 34), submitted after his deposition wherein he admitted that the procedure was not a medical experiment and "after institution of litigation, is generally of minimal value." *TP Laboratories v. Professional Positioners, Inc.*, 724 F.2d at 972. "Where, as here, a party has been examined extensively at deposition and then seeks to create an issue of fact through a later, inconsistent declaration, he has a duty to provide a satisfactory explanation for the discrepancy at the time the declaration is filed." *Sinskey v. Pharmacia Ophthalmics*, 982 F.2d at 498; *see Auld Company v. Chroma Graphics Corporation*, 714 F.2d at 1151 (Auld's affidavit failed to contradict prior testimony of inventor thereby proving "even less capable of showing genuine issue of material fact"). McGuire's affidavit does, however, at least explain the reason for the conflicting deposition testimony, i.e., that the lower risk associated with the less invasive surgery precluded characterizing the procedure as a medical experiment. (Docket Entry # 36, ¶ 9). This court accords more weight to Caspari's affidavit (Docket Entry # 34, ¶ 5(c)) and finds that Caspari's averment bolsters McGuire's explanation and makes it satisfactory.

■ It is well settled that the patentees can escape the statutory bar "where such sale was primarily for a bona fide experimental purpose to perfect the invention rather than for commercial exploitation." *Paragon Podiatry Laboratory v. KLM Laboratories*, 984 F.2d 1182, 1185 (Fed.Cir.1993); *accord Sinskey v. Pharmacia Ophthalmics*, 982 F.2d at 498 (to avoid statutory bar, "it must be shown that the activity was 'substantially for purposes of experiment' "); *Baker Oil Tools, Inc. v. Geo Vann, Inc.*, 828 F.2d at 1563. Use is not a public use or sale "so long as the inventor is engaged, in good faith, in testing [his] operation." *TP Laboratories v. Professional Positioners, Inc.*, 724 F.2d at 970.

■ The Federal Circuit has repeatedly emphasized that this court must consider the "totality of the circumstances" to determine the nature of the public use or sale. *See Sinskey v. Pharmacia Ophthalmics*, 982 F.2d at 498. Several factors, particularly objective factors, weigh in this determination. *See Baker Oil Tools, Inc. v. Geo Vann, Inc.*, 828 F.2d at 1564 (listing factors);[8] *see also Continental Can Company U.S.A., Inc. v. Monsanto Company*, 948 F.2d 1264, 1269 (Fed.Cir.1991) (listing factors and citing *Baker*). Furthermore, not only is it necessary to consider certain pertinent factors, but this court must also bear in mind the policies underlying the statutory bar. *Manville Sales Corporation v. Paramount Systems, Inc.*, 917 F.2d at 549–550 (enumerating underlying policies).[9]

■ It is undisputed that the patient paid McGuire his normal surgical fee for the March 30, 1988 operation. Payment alone, however, does not make a *per se* case of a section 102(b) bar. *Baker Oil Tools, Inc. v. Geo Vann, Inc.*, 828 F.2d at 1564. And, examining the circumstances of the payment,

---

8. Factors include the amount of control McGuire retained over the March 30, 1988 operation, the extent of public testing required in light of the nature of the invention, the length of the test period, whether the patient paid McGuire for his services, whether the patient was bound by a confidentiality agreement or obligation, who conducted the operation, and the degree McGuire commercially exploited the operation to the public. *Baker Oil Tools, Inc. v. Geo Vann, Inc.*, 828 F.2d at 1564.

9. The underlying policies include:

discouraging removal of inventions from the public domain that the public reasonably has come to believe are freely available; favoring the prompt and widespread disclosure of inventions; allowing the inventor a reasonable amount of time following sales activity to determine the potential economic value of a patent; and prohibiting the inventor from commercially exploiting his invention beyond the statutorily prescribed time.

*Envirotech Corporation v. Westech Engineering, Inc.*, 904 F.2d at 1574.

McGuire did not commercially exploit the operation through advertising or initiate a sales campaign prior to the one year grace period. *See, e.g., Manville Sales Corporation v. Paramount Systems, Inc.,* 917 F.2d at 550 (noting that Manville did not notify sales personnel or begin sales campaign to market invention). Preventing commercial exploitation is one of the underlying purposes of section 102(b).

It is also undisputed that McGuire failed to obtain a waiver or release from the patient indicating the experimental nature of the operation. *See Paragon Podiatry Laboratory v. KLM Laboratories,* 984 F.2d at 1186 ("assertion of experimental sales, at a minimum, requires that customers must be made aware of the experimentation"). The orthotic devices at issue in *Paragon,* however, were sold from Paragon to ordering doctors without any assurance of confidentiality or retention of control. Here, McGuire's assistants are bound to confidentiality through the patient-physician relationship (Docket Entry # 34, ¶ 5(b)). *See, e.g., TP Laboratories v. Professional Positioners, Inc.,* 724 F.2d at 972 ("pledge of confidentiality is indicative of the inventor's continued control which here is established inherently by the dentist-patient relationship"). Therefore, despite the absence of a confidentiality agreement or the awareness by the patient of the experimental nature of the operation which this court considers in its determination, McGuire did not place his invention outside his control. In addition, by its very nature, the patient cannot resell the implanted cannulated screw. Nor does the public have an unrestricted view of the device. *See, e.g., Manville Sales Corporation v. Paramount Systems, Inc.,* 917 F.2d at 550 (noting it very unlikely that public would see the new design).

The testing period in relationship to the testing period for other similar procedures corresponds with common practice. *See TP Laboratories v. Professional Positioners, Inc.,* 724 F.2d at 972 (noting factor of length of testing period in relationship to other similar devices). Caspari testified that it is common to test surgical procedures on human

patients and that the procedure employed by McGuire was consistent with the common practice in performing such testing. (Docket Entry # 34, ¶ 5).

It is also true that the operative notes and the follow up visit notes fail to describe the operation as experimental which circumstantially evidences a non-experimental purpose. *U.S. Environmental Products, Inc. v. Westall,* 911 F.2d at 717. McGuire, however, subsequently corresponded with Goble shortly after the operation and noted that he was "increasingly convinced that this may be the way to do things." (Docket Entry # 36, Ex. 8).

Turning to the number of tests, McGuire only performed one operation outside the one year grace period. Although one test may invoke a section 102(b) bar, *Paragon Podiatry Laboratory v. KLM Laboratories,* 984 F.2d at 1188, the existence of only one operation outside the grace period militates in favor of denying summary judgment. The short period of time does not create an extensive period of exploitation. Further, McGuire continued to work on perfecting the operation to determine whether using the cannulated interference screw as claimed would work for its claimed, intended purpose. *See, e.g., TP Laboratories v. Professional Positioners, Inc.,* 724 F.2d at 972 ("the test of necessity had to run for a considerable time and on several patients before the inventor could know whether 'it was what he claimed it to be' ").[10]

Finally, *Sinskey* is distinguishable because it involved a greater number of tests prior to the critical date. *See Sinskey v. Pharmacia Ophthalmics,* 982 F.2d at 497. In addition, unlike McGuire's affidavit in the case at bar, the post deposition affidavit at issue in *Sinskey* was the only evidence presented by Sinskey to rebut Pharmacia's *prima facie* case. Moreover, the affidavit in *Sinskey* failed to address, let alone reconcile, the facially inconsistent statements. *See Sinskey v. Pharmacia Ophthalmics,* 982 F.2d at 497–498.

In sum, the patentees came forward with convincing evidence that the primary or sub-

---

**10.** It is worth noting that, "reduction to practice is not a requirement of the on-sale bar." *Para-*

*gon Podiatry Laboratory v. KLM Laboratories,* 984 F.2d at 1187 & n. 5.

stantial purpose of the March 30, 1988 operation was experimental. The underlying policies of section 102(b) do not necessitate allowing the summary judgment motion. Acufex fails to meet its burden. Summary judgment is therefore improper based on the statutory bar of section 102(b).

◼ Acufex additionally seeks summary judgment on the basis that its screw does not infringe, literally or under the doctrine of equivalents, claim 4 of the '421 patent. Acufex submits that its screw lacks the drill feature for drilling into a bone mass which is claimed in the '421 patent. (Docket Entry ## 27 & 39).

The patentees contend that the term drill is disputed. Relying on the testimony of Russell, the patentees urge that a drill is anything which creates a hole or opens or enlarges an existing hole and therefore includes a pointed tip with threads. Hence, Acufex' screw infringes claim 4 because it has a pointed tip which pushes into the mass of the bone block and the bone thereby creating or enlarging an existing opening. (Docket Entry # 32).

With respect to summary judgment in the context of a noninfringement argument, Acufex is entitled to summary judgment "by pointing out that the patentee[s] failed to put forth evidence to support a finding that a limitation of the asserted claim was met by the structure in the accused device[ ]." [11] *Johnston v. IVAC Corporation,* 885 F.2d 1574, 1578 (Fed.Cir.1989). As the nonmoving parties, the patentees must then designate specific facts showing a genuine issue for trial. This court therefore examines whether the patentees' proof is "sufficient to satisfy the legal standard for infringement" literally or under the doctrine of equivalents. *London v. Carson Pirie Scott & Co.,* 946 F.2d 1534, 1538 (Fed.Cir.1991). "Such proof is sufficient if 'the evidence is such that a reasonable jury could return a verdict for [the patentees].'" *London v. Carson Pirie Scott & Co.,* 946 F.2d at 1538. Conclusory statements or general assertions of fact issues " 'are insufficient to shoulder' " the pat-

entees' burden. *Johnston v. IVAC Corporation,* 885 F.2d at 1578.

◼ The patentees have the underlying burden of proving infringement by a preponderance of the evidence. *Morton International, Inc. v. Cardinal Chemical Co.,* 5 F.3d 1464, 1468 (Fed.Cir.1993). The initial step in determining infringement is claim construction. *Morton International, Inc. v. Cardinal Chemical Co.,* 5 F.3d at 1468. Having determined what is patented, "[t]he second step is to decide whether each limitation in the properly construed claim[ ] is found, either literally or equivalently, in the allegedly infringing" device. *Morton International, Inc. v. Cardinal Chemical Co.,* 5 F.3d at 1468.

◼ Under the first determination, that of construing the claim, this court cannot alter what the patentees chose to claim in the '421 patent. Limitations in the specification cannot be read into the claims. *Intervet America v. Kee–Vet Laboratories,* 887 F.2d 1050, 1053 (Fed.Cir.1989). On the other hand, this court can examine the specification and the prosecution history, as interpreted by one skilled in the art, to determine the meaning of a term in a claim. *Tol–O–Matic, Inc. v. Proma Produkt–Und Marketing Gesellschaft,* 945 F.2d 1546, 1549–1550 (Fed.Cir. 1991); *Specialty Composites v. Cabot Corporation,* 845 F.2d 981, 986 (Fed.Cir.1988); *Locite Corporation v. Ultraseal, Ltd.,* 781 F.2d 861, 867 (Fed.Cir.1985). Ascertaining the meaning of a term in a claim "is not to be confused with adding an extraneous limitation appearing in the specification." *Du Pont De Nemours & Co. v. Phillips Petroleum,* 849 F.2d 1430, 1433 (Fed.Cir.), *cert. denied,* 488 U.S. 986, 109 S.Ct. 542, 102 L.Ed.2d 572 (1988).

◼ Interpreting claims is a question of law dependent on underlying facts. *Tol–O–Matic, Inc. v. Proma Produkt–Und Marketing,* 945 F.2d at 1549. A genuine issue of material fact arises when the underlying evidentiary facts are in conflict. *Johnston v.*

---

11. As discussed *infra,* Acufex put forth evidence that its screw lacks the. drill feature claimed in the '421 patent.

*IVAC Corporation,* 885 F.2d at 1578. As aptly explained in *Johnston:*

A disputed issue of fact may, of course, arise in connection with interpretation of a term in a claim if there is a genuine evidentiary conflict created by the underlying probative evidence pertinent to the claim's interpretation. However, without such evidentiary conflict, claim interpretation may be resolved as an issue of law by the court on summary judgment taking into account the specification, prosecution history or other evidence as held in *Howes.* Conflicting opinions on the meaning of a term which are merely conclusory do not create such evidentiary conflict.

*Johnston v. IVAC Corporation,* 885 F.2d at 1579–80 (citations omitted).

■ In addition, each element in a claim is essential. In order for this court to find infringement, the patentees "must show the presence of every element or its substantial equivalent in" the Acufex screw. *Lemelson v. United States,* 752 F.2d 1538, 1551 (Fed. Cir.1985). If an accused device does not literally infringe an element of a claim, the patentees may nevertheless escape summary judgment by showing a substantial equivalent for the drill in the Acufex screw, i.e., the pointed screw tip.

■ Under the doctrine of equivalents, "infringement may be found if an accused device performs substantially the same function in substantially the same way to achieve substantially the same result." *London v. Carson Pirie Scott & Co.,* 946 F.2d at 1538. The purpose of the doctrine is to prevent copyists from evading patent claims by making insubstantial changes which, from the perspective of one skilled in the art, add nothing of significance to the claimed invention. *Valmont Industries, Inc. v. Reinke Manufacturing Co., Inc.,* 983 F.2d 1039, 1043 (Fed.Cir.1993). Application of the doctrine is the exception and not the rule. *London v. Carson Pirie Scott & Co.,* 946 F.2d at 1538.

Turning to the construction of the term drill, claim 4 incorporates claim 3 "wherein the threaded device has a threaded body and includes a drill extending from one or a first end." The specification describes the term drill in a number of places. First, the specification notes the cannulated interference screw as "having a *drill* end for both *drilling a hole into bone mass* followed by the interference screw threads, which threads have at least one leading thread for cutting into that drilled hole." (Docket Entry # 36, Ex. 18). Thereafter, the specification states in various places that:

The interference screw preferably includes a cylindrical body with a fluted drill on a forward end and is threaded from that fluted drill to a rear end. The flutes of the drill are cut into the adjacent threads to provide self-tapping sharp cutting edges, that follow the fluted drill into a bone mass.... The screw 10, as shown best in FIGS. 1 through 4, includes a drill 11 that extends longitudinally from its forward end that preferably incorporates three (3) longitudinal flutes.... Thereby, in turning the screw 10 into a bone mass, the drill 11 will form a hole and travel into that bone mass ... and cut into that bone mass....

(Docket Entry # 36, Ex. 18). The specification therefore clarifies the meaning of the term drill as drilling a hole into a bone mass.

Carlozzi attests that "the Acufex screw lacks the 'drill' tip" noted in the claimed invention and "[t]he Acufex screw does not 'drill into a bone mass.'" Because the Acufex screw does not drill a passage through bone or cut into bone, it does not literally infringe claim 4.

■ Nor does the doctrine of equivalents provide the patentees with a means to avoid summary judgment. First, the doctrine is not regularly invoked. *London v. Carson Pirie Scott & Co.,* 946 F.2d at 1538. Second, Russell's testimony does not create an evidentiary conflict.

Russell admittedly testified that a screw with a pointed tip could qualify as a drill because when a screw turns into anything, it is going to open a passage for itself or it is going to create a hole. (Docket Entry # 33, Russell deposition). Carlozzi unequivocally established, however, that, "The spiral tip of the Acufex screw is not designed for, and does not, drill into or cut into bone." (Dock-

400

et Entry # 27, Ex. D, ¶ 9). Rather, the Acufex screw requires a separate drill bit to drill the holes into the bone mass. (Docket Entry # 27, Ex. D, ¶ 5). The Acufex screw itself does not perform substantially the same function of drilling a passage through bone in substantially the same way as the claimed invention. Nor does the Acufex screw perform substantially the same function of cutting into bone in substantially the same way as the claimed invention. The fact that Acufex' brochure describes the screw as having a pointed tip does not establish that this pointed tip performs substantially the same function in substantially the same way, as interpreted by one skilled in the art, as the drill in claim 4 of the '421 patent. (Docket Entry # 27, Ex. D, ¶ 8). Moreover, Russell's testimony relied on by plaintiffs and summarized *supra* was propounded during the course of litigation and therefore has little if any effect on what the words in claim 4 mean. *See Lear Siegler, Inc. v. Aeroquip Corporation,* 733 F.2d at 889 ("litigation-induced pronouncements of inventor ... have no effect on what the words of that document in fact do convey"). Summary judgment as to claim 4 is therefore appropriate inasmuch as the Acufex screw does not infringe literally or equivalently the drill feature of claim 4 of the '421 patent.

### CONCLUSION

In accordance with the foregoing discussion, this court **RECOMMENDS** [12] that Acufex' motion for summary judgment (Docket Entry # 26) be **DENIED** as to patent invalidity under section 102(b) and **ALLOWED** as to noninfringement of claim 4. This court further **RECOMMENDS** [13] denial of plaintiffs' cross motion for summary judgment (Docket Entry # 32).[14]

---

12. Any objections to this Report and Recommendation must be filed with the Clerk of Court within ten days of receipt of the Report and Recommendation to which objection is made and the basis for such objection. Any party may respond to another party's objections within ten days after service of the objections. Failure to file objections within the specified time waives the right to appeal the district court's order.

*United States v. Escoboza Vega,* 678 F.2d 376, 378–79 (1st Cir.1982); *United States v. Valencia–Copete,* 792 F.2d 4, 6 (1st Cir.1986).

13. See footnote number 12.

14. See footnote number seven.