HELIFIX LIMITED, Plaintiff,

v.

BLOK–LOK, LTD, and William Scott Burns, Defendants,

v.

HELIFIX NORTH AMERICA CORPORATION, Third–Party Counterclaim Defendant.

No. CIV.A. 98–11093–REK.

United States District Court, D. Massachusetts.

Nov. 5, 1998.

Peter E. Gelhaar, Katherine L. Parks, Donnelly, Conroy & Gelhaar, Boston, MA, for Plaintiffs.

H. Bissell Carey, III, Robinson & Cole, Boston, MA, for Defendants.

## Opinion

KEETON, District Judge.

### I.

Pending for decision is Defendants' Renewed Motion for Summary Judgment (Docket No. 49, filed September 25, 1998) together with Memorandum in Support (Docket No. 51, filed September 25, 1998). Plaintiff filed a Memorandum in Opposition (Docket No. 59, filed October 9, 1998). Defendants filed a Reply Memorandum (Docket No. 60, filed October 21, 1998). Plaintiff filed a Sur–Rebuttal to Defendants' Reply to Plaintiff's Response to Defendants' Renewed Motion for Summary Judgment (Docket No. 63, filed October 28, 1998).

### II. Procedural Background

This case involves Plaintiff's claim against Defendants for patent infringement (Count I of the Verified Complaint, Docket No. 1, filed June 4, 1998) and Defendants' counterclaim for declaratory judgment that Plaintiff's patent is invalid (Count I of the Amended Counterclaims, Docket No. 19, filed July 9, 1998). The court held a hearing on September 15, 1998, the first part of which was a Markman hearing, in which the parties presented evidence and argument as to the scope of the patent. In the second part of the hearing, the parties also proffered evidence and made argument regarding the possible invalidity of the patent at issue due to the anticipation bar or the on-sale bar of 35 U.S.C. § 102(b) or the inventor's alleged fraud upon the Patent and Trademark Office ("PTO"). The Defendants renewed their motion for summary judgment as to the patent infringement claim and the declaratory judgment counterclaim on these grounds.

### III. The Factual Background Relevant to Defendants' Motion for Summary Judgment

Beginning in 1992, Defendants, Blok–Lok, Ltd. and its president, William Scott Burns (collectively "Blok–Lok"), began serving as distributor of the products of Plaintiff ("Helifix"), designed for reinforcing the exterior walls of buildings with helical ties in order to prevent the bricks or masonry from becoming detached from the building frame and falling off. In March, 1997, Helifix terminat-

ed the arrangement and the parties are currently competitors.

The products relevant to this case involve the tools and equipment necessary to practice one method of tying multiple layers ("wythes") of a building's wall together. Helifix filed for a patent on this method, along with certain of the tools and equipment necessary to practice it, in February, 1994, in the patent application 08/204,465 (the "'465 Application"). After several steps of prosecution, the PTO eventually granted to Helifix United States Patent No. 5,687,801 (the "'801 Patent"), which covers the method at issue, requiring Helifix to patent the other inventions, particularly the tie-insertion tool, separately.

More than one year before Helifix filed the '465 Application, in January, 1993, Helifix and Blok–Lok attended the World of Concrete Trade Show, at which they distributed and displayed a brochure (the "'93 Brochure") that describes a method of reinforcing multi-wythed buildings by means of a "tie," using no chemical resin (Def. Ex. 519, the "DryFix" method)(Sweeney Dep. p. 103–4; Paterson Dep. p. 61).

Helifix filed this action against Blok–Lok on June 4, 1998, alleging, among other claims, that Blok–Lok was infringing Helifix's '801 patent by selling products designed to be used in a way that would infringe Helifix's patented method and instructing Blok–Lok's customers in Helifix's method, intending that those customers would use and thus infringe Helifix's patented method.

### IV.  Issues Presented by the Pending Motion

#### A.  Fairness of the Procedures

Helifix complains that the hearing on September 15, 1998 was unfair, that Helifix expected a trial, instead was "sandbagged" into a Markman hearing, and then was further "sandbagged" by the cross examination of Robert Paterson that exceeded the scope of the direct examination. (Plaintiff's Sur–Rebuttal pp. 2, 14). Further, Helifix accuses Blok–Lok of having engaged in an "ex parte gambit, frolic and detour and improper hearing on its *ex parte* examination directed to

the renewed motions for a summary judgment." (Plaintiff's Sur–Rebuttal p. 14).

Helifix has either forgotten or misunderstood the course of events at the September hearing. The court learned on the day before the trial that jurors would not be available; that was not Blok–Lok's fault and the court could do nothing to remedy the situation. Because the scope of the patent was a critical issue and time had been set aside on the court's calendar to hear the case on September 15, and the parties were present and prepared, the court determined that a Markman hearing would be a valuable use of the time and informed the parties on September 14 that it intended to proceed in this fashion. Helifix, if it was not prepared to address the Markman issue, has only itself to blame.

At the end of the Markman hearing, the court was inclined to grant Blok–Lok's motion for summary judgment which it had earlier denied through an interlocutory order. Because the earlier denial was interlocutory, it was within the court's prerogative to reverse its ruling. Blok–Lok did not bamboozle the court through any "ex parte" impropriety into reconsidering the motion for summary judgment. Rather, proceedings were of record (not "ex parte"), and it had become clear to the court that the on-sale bar and the anticipation bar (discussed below) were potential bars to the validity of Helifix's '801 patent. The court gave Helifix the opportunity to address these issues, and Helifix's attorney said he was pleased ("splendid," Hearing Transcript p. 116). The court also allowed the filing of post-hearing submissions. The court rejects the contention that the procedures did not adequately give Helifix the opportunity to present its opposition to Blok–Lok's motion for summary judgment.

#### B.  Claim Construction

##### 1.  The Prescribed Approach

In *Markman,* the Supreme Court established that the determination of the scope of a patent is "exclusively within the province of the court." *Markman v. Westview Instru-*

*ments, Inc.,* 517 U.S. 370, 372, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996).

In discharging this responsibility, a court looks first to the words of the claim itself. *See Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576, 1582 (Fed.Cir.1996). Generally, the words of the claim are given their "ordinary and customary" meaning, but a patentee may define them in a different way. If some assertion is made that the words have a meaning other than their plain meaning, the court may look to the patent specification or prosecution history to see whether the patentee has in one of those places stated a clear definition. *See id.* Thus, "a technical term used in a patent document is interpreted as having the meaning that it would be given by persons experienced in the field of the invention, unless it is apparent from the patent and the prosecution history that the inventor used the term with a different meaning." *Hoechst Celanese Corp. v. BP Chems. Ltd.,* 78 F.3d 1575, 1578 (Fed.Cir.1996).

Although a court may look to the specifications to resolve an ambiguous term or to find that the patentee has defined some term in a manner other than the ordinary meaning, *see Vitronics,* 90 F.3d at 1582, it is not appropriate to give effect to a patentee's attempt to impose upon the claim, through the specification, some limit that is not included in the claim itself. *See Electro Med. Sys., S.A. v. Cooper Life Sciences, Inc.,* 34 F.3d 1048, 1054 (Fed.Cir.1994)("claims are not to be interpreted by adding limitations appearing only in the specification"); *In re Van Geuns,* 988 F.2d 1181, 1184 (Fed.Cir.1993)("limitations are not to be read into the claims from the specification").

### 2. The Elements of Claim One

The recitation immediately below breaks Claim One into its various parts for convenience of analysis. Numbers that do not appear in the original text of the patent claim are added to facilitate references:

What is claimed is:

A method of securing (*1*) two or more wythes in a building structure (*2*) utilizing a helical tie member (*3*) having longitudi-nal helical flutes (*4*) terminating at a cutting end at one end and terminating at a remote end opposite the cutting end comprising the steps of:

(*5*) drilling a first wythe to a diameter less than than (sic) a diameter of the flutes on the tie to be inserted.

(*6*) drilling a pilot hole in a second wythe to a predetermined depth.

(*7*) inserting the remote end of the tie into a tool which (*8*) impactingly drives the tie and (*9*) rotatably permits the same to rotate as a helical bed is developed in the first wythe due to penetration by the tie.

(*10*) passing the flutes into the second wythe and continuing to impactingly drive the tie to a base of the pilot hole.

(*11*) removing the driving tool from the remote end of the tie.

and thereafter (*12*) refinishing the remote end of the tie in accordance with mandates of the site.

### 3. The Meaning of "Tool"

The central dispute in this case is whether the scope of the '801 patent includes, from the patent specification, a limitation based upon the tie-insertion tool. For the sake of perspective, I note that this matter will be important when we consider whether the '93 Brochure "anticipated" the '801 patented method (i.e. whether the '93 Brochure would have enabled a person of ordinary skill in the art to figure out and practice Helifix's patented method). Helifix's assertion is that the '93 Brochure cannot have enabled a person to have practiced the method because the brochure did not tell the reader how to build the tool that would allow him or her to have practiced the method. Blok–Lok argues that the patent is not limited by the tool. That is, because the '801 patent does not have to be practiced by any particular type of tool, the failure of the '93 Brochure to teach how to build the Helifix insertion tool does not preclude that brochure from anticipating the patent.

The '801 patent specification explains and portrays the tool that Helifix had created to practice the patented method. The specifica-

tion states, "It is necessary to appreciate that the power source is a hammer drilling machine fitted with an SDS chuck." (Plaint. Ex. 1, col. 5, lines 44–5). This language is as close as the patent comes to defining "tool" in a manner different from the ordinary usage of the word.

I conclude that Helifix is not correct in arguing that the patent could only be practiced with the tool described and illustrated in the patent specification. In rejecting the '465 Application—in which Helifix was attempting to patent in a single patent the tie-insertion tool and the method that ultimately was patented in Claim One (Def. Ex. 557)—the PTO Examiner wrote that the method was "distinct" from the tool because "the adapter is not required to insert the tie." (Def. Ex. 557, "Restriction/Election" document, p. 2–3). Accepting that determination, I conclude that the "tool" referred to in Claim One is not limited by the statements made about Helifix's tool in the patent specification.

## C. Blok–Lok's Summary Judgment Motion

### 1. Introduction

The determinations explained above about the scope of the patent make it possible for the court to determine also whether Helifix's '801 patent is invalid on one or more of the following grounds: (1) the description of the invention in a printed publication more than a year prior to the patent application (35 U.S.C. § 102(b)), (2) the offering for sale of the invention in the United States more than a year prior to the patent application (35 U.S.C. § 102(b)), and (3) the inventor's alleged fraud upon the Patent and Trademark Office ("PTO") in his failure to reveal the '93 Brochure as pertinent prior art.

### 2. The Summary Judgment Standard

Summary judgment should be granted only where the court, viewing the evidence in the light most favorable to the non-moving party, determines that no genuine dispute of material fact exists. *See* Fed.R.Civ.P. 56. The movant has the "initial responsibility of informing the district court of the basis for

its motion, and identifying those portions" of the record showing the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A factual question is material if a reasonable jury could return a verdict for the non-moving party based at least in part on its determination of the factual question. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In a patent validity action such as this one, the movant's burden is even heavier than in other contexts generally because of the presumption of the validity of the patent. *See* 35 U.S.C. § 282. Nevertheless, if the moving party succeeds in making an initial showing that no genuine dispute of material fact exists, then the non-moving party must demonstrate that "every essential element of its claim or defense is at least trialworthy." *Price v. General Motors Corp.,* 931 F.2d 162, 164 (1st Cir.1991).

### 3. Anticipation

#### (a) Introduction

■ A statutory provision, 35 U.S.C. § 102(b), instructs that no patent is to issue if "the invention was ... described in a printed publication in this or a foreign country ... more than one year prior to the date of the application for patent in the United States." Invalidity under this provision, termed "anticipation," requires that the party arguing for invalidity prove by clear and convincing evidence

that each and every limitation of the claimed invention be disclosed in a single prior art reference. In addition, the reference must be enabling and describe the applicant's claimed invention sufficiently to have placed it in possession of a person of ordinary skill in the field of the invention.

*In re Paulsen,* 30 F.3d 1475, 1478–9 (Fed. Cir.1994) (citations omitted).

#### (b) Evidence of Publication

The '93 Brochure was distributed and displayed to the public at the World of Concrete Trade Show in January, 1993 (Sweeney Dep. pp. 103–4; Paterson Dep. p. 61), more than a year before the '465 Application, the first patent application which included the method

patented in Claim One, was filed. As Helifix's attorney stated, "we can't duck [the '93 Brochure], we printed it, we showed it." (Hearing Transcript p. 9). Thus, Helifix has admitted that the '93 Brochure was publicized a year before the '465 Application was filed.

### (c) The Person of Ordinary Skill

■ The next step in determining whether the '93 Brochure anticipated the '801 patent is establishing the standard of the "person of ordinary skill in the field of the invention." Blok–Lok argued in its Reply Brief that the person of ordinary skill is someone who "has engineering and construction abilities in order to understand the stresses on buildings with multiple wythes..." (Defendant's Reply p. 12). Helifix proffers "Barney the Brick-Layer" and "Harry the Hod Carrier" as exemplars of persons of ordinary skill. The court does not accept the underlying premises of Helifix's suggestions. First, the field of the invention is not masonry work or bricklaying. The patent specification states, under the title, "field of the invention":

> The present invention is directed to the subject matter of reinforcing multiple walls usually in a building structure in which a tie is employed to secure two adjacent walls which are parting or otherwise need a tieing arrangement.

(Def. Ex. 559, '801 patent, col. 1, lines 16–19). Thus, the person of ordinary skill must be operating within the world of persons who reinforce multi-wythed buildings with ties. Second, the person of ordinary skill need not be the least sophisticated person in the field, as Barney and Harry are. The Federal Circuit has established that:

> The person of ordinary skill is a hypothetical person who is presumed to be **aware of all the pertinent prior art.** The actual inventor's skill is not determinative. Factors that may be considered in determining level of skill include: type of problems encountered in art; prior art solutions to those problems; rapidity with which innovations are made; sophistication of the technology; and educational level of active workers in the field.

*Custom Accessories, Inc. v. Jeffrey–Allan Indus., Inc.,* 807 F.2d 955, 962 (Fed.Cir.1986)(emphasis added)(footnotes omitted). Applications of the standard have confirmed that this standard envisions persons of relative sophistication within the field of the invention. *See In re Paulsen,* 30 F.3d 1475, 1481 (person of ordinary skill in computer industry capable of "providing the circuitry necessary to make the device operable for use as a computer"); *Biogen, Inc. v. Amgen, Inc.,* 973 F.Supp. 39, 43 (D.Mass.1997)(laboratory technician not person of ordinary skill in field of inducing nonhuman cells to produce human proteins because technicians not familiar with literature).

Because Helifix, as well as Defendants, never presented to the court any evidence regarding the experience or level of education of persons in the field, the court must rely on common sense and on the factor of evidence of familiarity with the pertinent literature in conceiving the characteristics of the hypothetical person of ordinary skill. Construction workers whose ordinary function is to follow orders are not expected to seek out and read literature on new techniques, or to attend the World of Concrete Trade Show. Rather, persons whose function includes being familiar with the literature in the field might be expected to supervise building-reinforcement crews and would be likely to attend the World of Concrete Trade Show. Another group who might attend such a trade show would be those interested in research and development, including employees of Helifix's competitors. Persons in groups of these kinds, rather than "Barney" and "Harry," are those to whom a court might look for characteristics of the hypothetical person of reasonable skill in the field of building reinforcement.

### (d) Is Each and Every Element of Claim One Explained, Illustrated or Implied in the '93 Brochure?

#### (1) Steps in dispute

■ For the anticipation bar to operate, every element of Claim One must be either directly or implicitly laid out in the '93 Brochure. No genuine dispute arose regarding

whether the '93 Brochure depicted Steps *1–4, 6, 7,* and *11–12* because the '93 Brochure plainly depicts all of those steps. The heart of the debate involved the other steps—*5* and *8–10*. In essence, the arguments about those steps center on four issues: first, whether the '93 Brochure adequately shows that the pilot hole should be smaller in diameter than the diameter of the helical tie (step *5* ); second, whether it shows that an impacting force is to be placed on the tie (steps *8, 10* ); third, whether it shows that a rotational force is not to be placed on the tie (step *9* ); and fourth, whether the '93 Brochure would practically enable the reader to practice the method since it did not tell the reader how the tool should operate.

(2) Did the '93 Brochure adequately indicate that the pilot hole should be smaller in diameter than the diameter of the tie?

Paterson admitted that Diagram 1 under the label "DryFix" portrays the original drill hole as being smaller in diameter than the diameter on the flutes of the ties pictured in diagram 2. (Hearing Transcript p. 121). Paterson also admitted that, "as a matter of elementary physics," the tie would be ineffective if the pilot hole were not smaller than the tie. (Hearing Transcript p. 121). Although the woman or man on the street might not realize all this, it would be obvious to the person of ordinary skill in the field because the person of ordinary skill would understand the elementary physical forces at work in the process. I conclude that the '93 Brochure both shows and implies that the pilot hole must be smaller in diameter than the diameter of the helical tie (step *5* ).

(3) Does the '93 Brochure show that an impacting force must be placed on the tie?

Helifix argues that the '93 Brochure does not instruct the reader that the tool "impactingly" drives the tie as opposed to putting a rotational force upon the tie. In his testimony, however, Robert Paterson admitted that the '93 Brochure "certainly shows the impacting" in the form of the "chevron" symbols next to the tool in diagram 2 of the "DryFix" section. (Hearing Transcript p. 125). Thus, he admitted that Steps *8* and *10* are pictured in the '93 Brochure.

(4) Does the '93 Brochure show that a rotational force is not to be placed on the tie?

The '93 Brochure shows, through the "chevron" symbol, that the action of the tool is an impacting one and does not portray any rotational force through a spinning symbol or through words. I conclude that the lack of a rotational force is clear. Paterson testified that many people tend mistakenly to expect a rotational force even after reading literature such as the '93 Brochure. That tendency, however, is not relevant because the court is not concerned with what "most people" would think. The focus is rather on the hypothetical person of ordinary skill. The hypothetical person of ordinary skill would realize, first, that to put a rotational force upon the tie would create a hole in the masonry that is equal in size to the size of the tie and, therefore, the tie would not adhere to the masonry. Second, the text at the beginning of the '93 Brochure explains that the design of the Helifix tie "causes it to auger as it is installed." Paterson admitted that this phrase would indicate that no rotational force is placed on the tie as it is driven into the wythes because the tie will, by its design, automatically spin. (Hearing Transcript p. 129). I conclude that the '93 Brochure plainly shows that no rotational force is to be placed by the tool on the helical tie.

(5) Does the '93 Brochure fail to enable the reader to practice the method because it does not tell the reader how to make the insertion tool?

Helifix argues that the '93 Brochure did not enable the reader to practice the patented method because the '93 Brochure did not explain how to make the insertion tool. As explained above, however, I have concluded that Claim One is not limited by the tool. The PTO determined, as quoted above, that Helifix's adapter is not the only tool by which the tie could be inserted. (Def. Ex. 557). Thus, the PTO thought other tools could be devised for the purpose of the '801 patent,

and I accept that determination. I conclude that, just as the hypothetical person of ordinary skill in *Paulsen* was advanced enough to create the circuitry required to run a computer, *see In re Paulsen*, 30 F.3d 1475, 1481, the hypothetical person of ordinary skill (at the time of the '93 Brochure) in the building-reinforcement industry is advanced enough to create a tool necessary to accomplish the patented method.

For these reasons, I conclude that, as a matter of law, the '93 Brochure instructs or, by implication, allows the reader to figure out every step of Claim One. The hypothetical person of ordinary skill, who has an understanding of the physics involved in the process of securing walls together and who has read the prior literature on the subject, would have understood Claim One's patented method from the '93 Brochure.

### (e) Helifix's Last Step Argument

Helifix's final argument regarding anticipation is that the '93 Brochure cannot be determined to have constituted anticipation of Claim One because Helifix had not yet taken the last step, as required by *Washburn & Moen Mfg Co. v. Beat 'Em All Barbed–Wire Co.*, 143 U.S. 275, 12 S.Ct. 443, 36 L.Ed. 154 (1892). *Washburn*, however, involved a case in which the Defendants were claiming that the plaintiff-patent-holder had not taken a sufficient step beyond the pre-existing inventions to support his patent; that is, that the plaintiff's invention was not sufficiently "novel." *See id.* 143 U.S. at 277, 12 S.Ct. 443. *Washburn* is not relevant to the issue at hand because Blok–Lok's argument is not that Helifix's invention was insufficiently novel. Rather, Blok–Lok's anticipation argument is that Helifix had publicized its invention too early. The only possible relevance of *Washburn* to this issue would be presented if Helifix's '801 patent took some step beyond what was shown in the '93 Brochure. The record does not support a determination that this happened. As explained above, the '93 Brochure implicitly or directly set forth every element of Claim One. Thus, I conclude that *Washburn* provides no precedent for holding that the anticipation bar of 102(b) does not apply to this case.

### 4. The On–Sale Bar

#### (a) Requirements of the On–Sale Bar

The court concludes that an independently sufficient ground for granting Blok–Lok's motion for summary judgment exists in the on-sale bar of Section 102(b) of 35 U.S.C. This section specifies that a patent is not to issue if "the invention was ... in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States."

The movant's burden is to show by clear and convincing evidence that the patented invention was on sale more than a year before the patentee filed a patent application for the invention. *See Manville Sales Corp. v. Paramount Systems, Inc.*, 917 F.2d 544, 549 (Fed.Cir.1990). The definition of "on-sale" can involve either evidence of an actual sale or evidence that the patentee offered the product for sale. *See Intel Corp. v. U.S. Int'l Trade Comm'n*, 946 F.2d 821, 830 (Fed.Cir. 1991). Proving that an invention was on-sale involves three parts. (1) The complete invention claimed must be embodied in or obvious in view of the thing offered for sale, (2) the invention must have been sufficiently tested to verify that it is operable and commercially marketable, and (3) the sale must be primarily for profit rather than for experimental purposes. *See King Instrument Corp. v. Otari Corp.*, 767 F.2d 853, 859–60 (Fed.Cir.1985). If the movant satisfies this burden, the opponent to a summary judgment motion must come forward with some evidence sufficient to raise a genuine dispute of material fact. *Sinskey v. Pharmacia Ophthalmics, Inc.*, 982 F.2d 494, 498 (Fed.Cir. 1992).

#### (b) Was the DryFix Method On–Sale?

It is Blok–Lok's burden to prove by clear and convincing evidence that the products necessary to practice the method of Claim One was "on-sale" more than one year before Helifix filed its application for a patent for Claim One's method. Blok–Lok has proffered the '93 Brochure that admittedly was distributed and displayed at the World of Concrete Trade Show in January, 1993

(Sweeney Dep. pp. 103–4; Paterson Dep. p. 61), more than one year before Helifix filed its '465 Application in February, 1994. The '93 Brochure, if not an offer in itself, provides very strong circumstantial evidence that the "DryFix" method was being made available for sale.

Various phrases and omissions in the '93 Brochure persuade the court that Helifix had made the "DryFix" method available for sale. First, nothing in the '93 Brochure indicates that the methods, tools, or other apparatus described are only experimental or are otherwise unavailable for sale. If, as Helifix alleges, the "DryFix" method really was not for sale, the '93 Brochure would have been deceptive. No "coming soon" disclaimer or "we expect" language is to be found in the '93 Brochure. Rather, it states that the "DryFix technique is used" (emphasis added) and that it is "ideal for use in multi-wythe composite walls." If, in fact, no tool was available for sale by which the buyer could implement the technique, this language does not make sense. It is more likely that the '93 Brochure was placing the products necessary to accomplish the DryFix method on sale.

Furthermore, on the back of the '93 Brochure, Helifix writes that "Helifix ties (the ties used in the "DryFix" method) have been subjected to extensive testing in a wide range of materials" (parenthetical phrase added), an indication that the product is ready for sale. Finally, the '93 Brochure includes a warranty on the back that refers to the Seller (Helifix) and to the buyer. If the '93 Brochure did not constitute an offer to sell or at least an indication that the products and methods described were available for sale, this warranty would be very odd indeed. Why would the reader be referred to as a "buyer" if Helifix did not intend that person purchase the products needed to practice the methods described in the brochure?

The '93 Brochure, with the phrases and omissions discussed above, and the admission of the Helifix employees who were present at the World of Concrete Trade Show that they distributed and displayed it, together provide the clear and convincing evidence needed to satisfy Blok–Lok's burden of proving a prima facie case that the method embodied in Claim One was on-sale for purposes of Section 102(b).

Because Blok–Lok has satisfied its burden in regard to whether the products necessary to practice the patented method was on sale, Helifix must show that a genuine dispute exists on this issue. Helifix argues that it has raised a genuine dispute because Paterson testified that it was not Helifix's "primary" goal to promote Dry–Fix at the World of Concrete Trade Show and that the adapter required to practice the Dry–Fix method was not functional. Helifix proffers a press release (App. B to Plaintiff's Sur–Rebuttal) that was issued in anticipation of the '93 World of Concrete Trade Show to prove these points but it supports instead the opposite inference. In it, Helifix announces,

> The DryFix system is used to pin masonry facings or veneers to brick, block or concrete backup and is ideal for multi-wythe composite walls ... Prompt delivery of all the necessary materials and tools is made from the present Toronto, Ontario base.

Helifix also proffers an invoice that it alleges shows a return of DryFix tools from Blok–Lok to Helifix because they were not functional. The document's only date is 7/27/98 (a facsimile machine transmission date) and the document appears to be a purchase, not a return, of goods. Thus, Helifix has not shown that a genuine dispute of material fact exists regarding whether the tools necessary to practice the patented method were available for sale.

(c) Was the Method Embodied in Claim One Sufficiently Described in the '93 Brochure?

I have already determined that the complete invention claimed was embodied in or obvious in view of the '93 Brochure (See Part IV.C.3(d) above).

(d) Was the Product Commercially Marketable or Only Experimental?

The on-sale bar will not apply to invalidate a patent if, at the time of the allegedly invalidating sale, the product is not commercially marketable or the sale is for experimental purposes. *See King Instrument*

*Corp. v. Otari Corp.*, 767 F.2d 853, 859–60. Blok–Lok has proffered evidence, as explained above in Part IV.C.4(b), that Helifix was marketing the Dry–Fix method at the World of Concrete Trade Show. This evidence, as explained above, leads to the strong inference that the product was marketable and that the method was not in an experimental stage. Helifix has not proffered admissible, *objective* evidence sufficient to support a finding that the product was unmarketable in January, 1993. Thus, Paterson's testimony that Helifix was uncertain about the marketability of DryFix is of little evidentiary weight. *See LaBounty Mfg., Inc. v. United States Int'l Trade Comm'n,* 958 F.2d 1066, 1071–2 (Fed.Cir.1992)("an inventor's subjective intent is immaterial when objective evidence points otherwise"). Blok–Lok has satisfied its burden that the DryFix method was commercially marketable and Helifix has not shown that a genuine dispute of material facts exists.

Similarly, the '93 Brochure is reasonably interpreted as implying that the DryFix method was not experimental. Helifix has not proffered admissible evidence sufficient to support a finding that it was only hoping to find customers to help it test the DryFix method. The Federal Circuit has been clear that, when a patentee wishes to avoid the on-sale ban by arguing that the sales were experimental, at a minimum, it must show that the customer was aware of the experimentation. *See id.* 958 F.2d at 1072. Helifix has not proffered admissible evidence sufficient to support a finding that prospective Helifix customers were aware that any sale would be for experimental purposes only. Thus, the experimentation argument does not stand in the way of applying the on-sale bar to Helifix's '801 patent.

### 5. Inequitable Conduct

Blok–Lok asserts that it is also entitled to summary judgment because Helifix, in filing for its patent on the DryFix method, failed to disclose the '93 Brochure to the PTO as prior art. Summary judgment based on inequitable conduct would be inappropriate in this case because fraud involves a matter of the plaintiff's subjective state of mind and such matters are generally better left to the jury. *See Hahn v. Sargent,* 523 F.2d 461, 468 (1st Cir.1975)("state of mind is difficult to prove and great circumspection is required where summary judgment is sought on an issue involving state of mind ."). Furthermore, the evidence proffered fails to show that no genuine dispute of material fact exists and thus the court could not grant summary judgment based upon this ground. This fact, however, does not impair the validity of other grounds for summary judgment.

### Interlocutory Order

For the foregoing reasons, it is hereby ORDERED:

(1) Defendants' Renewed Motion for Summary Judgment (Docket No. 49, filed September 25, 1998) is ALLOWED.

(2) At the next scheduled **Case Management Conference, set for 4:30 p.m., November 10, 1998,** the court will establish a schedule for all further proceedings required for final disposition of this case. The parties must file, not later than noon on November 10, 1998, jointly if possible and otherwise separately, their proposed schedules for the case.